618 A.2d 274

**MEDICAL MUTUAL LIABILITY INSURANCE SOCIETY OF MARYLAND**

v.

**Nicholas M. AZZATO, et al.**

**No. 547, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Jan. 13, 1993.

E. Dale Adkins, III (Gregory L. VanGeison and Anderson, Coe & King, on the brief), Baltimore, for appellant.

Henry E. Weil (Belli, Weil & Grozbean, on the brief), Rockville, for appellees.

Argued before CATHELL, MOTZ and HARRELL, JJ.

MOTZ, Judge.

The question presented in this case is whether a physician's medical malpractice insurer must provide coverage for injuries arising from the physician's distribution of cocaine and other controlled drugs to a patient when a Health Claims Arbitration panel has concluded that this distribution constituted malpractice. Because the medical malpractice policy provides an exclusion for injuries arising out of a criminal act, which this distribution of illegal drugs plainly was, we vacate the order of the Circuit Court for Montgomery County granting judgment for the physician and against the insurer.

(i)

This insurance coverage dispute arises out of a malpractice action filed against Dr. Nicholas M. Azzato, appellee, by his former patient, Regina Warsaw, and her husband, Lewis Warsaw. Dr. Azzato, a plastic surgeon, performed a number of surgical procedures on Mrs. Warsaw from 1984 through 1986. In 1984, he operated on her right nostril, and on January 21, 1986, he performed a similar operation on her left nostril. He testified that on each occasion he packed the affected nostril with a combination of Pontocaine and pharmaceutical cocaine to "anesthetize the nose and shrink the blood vessels down so there is less bleeding." Mrs. Warsaw claims he only packed her nose after the first operation; in any event, no one suggested that these procedures or medications were in any way inappropriate.

Shortly after her operation on the left nostril, however, Mrs. Warsaw heard Dr. Azzato and one of his nurses discuss some "pharmaceutical cocaine" that was in the office and she asked Dr. Azzato "a lot of questions" about

it. According to Mrs. Warsaw, "[a]t that point, he pulled a vial out of his coat ... and he had this little ivory spoon" and he offered her some cocaine. From that time on, Mrs. Warsaw began coming to Dr. Azzato's office, and then to his home, on a routine basis to obtain drugs—first, just cocaine, and then a host of other drugs, including seconal and morphine. As she told him after a few weeks, she had been addicted to PCP, speed and other drugs from 1973 through 1977 but was detoxified in 1977 and drug free until 1986 when she was given cocaine by Dr. Azzato. Nevertheless, Dr. Azzato continued to provide Mrs. Warsaw with drugs. She testified that he indicated that the drugs might help premenstrual syndrome ("PMS") and other medical problems.

Within the next few months, Dr. Azzato and Mrs. Warsaw began a personal relationship, in which they, *inter alia*, engaged in frequent ("hundreds of times") recreational drug use together; on occasion Mrs. Warsaw used "bags of drugs" provided by Dr. Azzato. During this period, Mrs. Warsaw continued to be Dr. Azzato's patient; indeed, he performed a minor surgical procedure on her in August, 1986, and a breast augmentation in September, 1986. In November, 1986, Mrs. Warsaw was admitted to the Psychiatric Institute for her mental and drug related problems. After six weeks of treatment, she was discharged from that hospital; a week after discharge, she again obtained drugs from Dr. Azzato. In April, 1987, she was admitted to Suburban Hospital as psychotic and near death from drug abuse. Ultimately, she was discharged from Suburban and after one final episode of drug use with Dr. Azzato, in May, 1987, she has had no further drug use or contact with Dr. Azzato.

On April 21, 1987, Dr. Azzato was arrested for illegal possession and distribution of valium, seconal, and cocaine. He pled guilty to two counts of violation of the controlled substance statute with respect to distribution of valium. Dr. Azzato was sentenced to a short period of incarceration in the Montgomery County Pre-release Center and is pres-

ently on probation under the jurisdiction of the Montgomery County Department of Parole and Probation. He has been suspended from medical practice by the Commission on Medical Discipline.

On July 7, 1987, Mr. and Mrs. Warsaw filed a malpractice claim against Dr. Azzato with the Health Claims Arbitration Office. Dr. Azzato requested that his insurer, appellant, Medical Mutual Liability Insurance Society of Maryland ("Medical Mutual"), undertake his defense and provide coverage for this claim. Medical Mutual refused to do so. Dr. Azzato retained other counsel to represent him. After a two day hearing, on May 5, 1989, a Health Claims Arbitration panel issued a decision finding Dr. Azzato liable to Mrs. Warsaw for $31,000 in past medical expenses and $104,000 in noneconomic damages and liable to Mr. Warsaw for $25,000 for loss of consortium, for a total award of $160,-000. On August 29, 1989, this award was confirmed by the Circuit Court for Montgomery County.

On March 21, 1992, Dr. Azzato, for the use of Mr. and Mrs. Warsaw and their attorney, filed the present coverage action, alleging breach of contract and negligence by Medical Mutual for failing to provide him coverage. Dr. Azzato asked that Medical Mutual be required to pay him $160,000, the amount of the judgment owed to the Warsaws, plus post-confirmation interest. The complaint did not seek reimbursement for Dr. Azzato's costs in defending the malpractice action. The parties filed cross motions for summary judgment. After hearing argument from counsel for both sides, on February 26, 1992, the circuit court granted summary judgment in favor of Dr. Azzato and against Medical Mutual in the amount of $160,000 [1] and post-judg-

---

1. The docket entries indicate that judgment was entered "in the sum of one hundred and fifty thousand dollars ($150,000)" plus post judgment interest. The transcript, however, plainly reflects that the trial judge stated:

> ... the entry will reflect entering judgment in favor of the plaintiff against the defendant, in the amount of $160,000 and costs.... and interest from today's date

ment interest. The court declined to award pre-judgment interest.

On appeal, Medical Mutual makes two arguments:

1. Medical Mutual's policy forbids recovery in this case, since it unambiguously excludes coverage for injuries arising out of criminal activities.

2. Medical Mutual is not precluded [by the arbitration award] from raising its policy defenses.

Dr. Azzato cross appeals, asserting that he is entitled to interest from August 29, 1989, the date of the confirmation of the arbitration award.

### (ii)

■ Dr. Azzato was covered for liability arising out of medical malpractice under two professional liability insurance policies issued by Medical Mutual. Both policies provide that Medical Mutual "will pay ... all sums" that Dr. Azzato "shall become legally obligated to pay as damages" because of "injury arising out of a medical incident" or "due to personal injury." Both policies then specifically exclude from this coverage injuries arising out of criminal acts performed by the insured. The first policy, covering the period from July 31, 1985 to July 31, 1986, provides that coverage does not apply

to injury arising out of any dishonest, fraudulent, criminal or malicious act or omission of any Insured.

The second policy, covering the period from July 31, 1986 to July 31, 1987, provides that coverage does not apply

to injury arising out of the performance by any named Insured of a criminal act.

The Court of Appeals has held similar language in a professional liability insurance policy to be unambiguous and to exclude coverage for losses resulting from criminal acts. *Aragona v. St. Paul Fire & Marine Ins. Co.*, 281 Md.

---

Medical Mutual does not rely on, or even raise, this discrepancy. In light of our holding, we need not address it.

371, 378 A.2d 1346 (1977). In that case, the Aragonas sued a lawyer for vicarious liability because of his partner's misappropriation of their funds and for his own negligence in failing to uncover the misappropriation; they recovered on both grounds. The Aragonas then sought to recover the amount of their judgment from the lawyer's malpractice insurer. In its policy, the insurance carrier had promised to pay

> all sums which the Insured shall become legally obligated to pay as damages arising out of the performance of professional services for others in the Insured's capacity as a lawyer and caused by the Insured or any other person for whose acts the Insured is legally liable.

281 Md. at 372, 378 A.2d 1346. The policy, however, excluded coverage for "any dishonest, fraudulent, criminal or malicious act or omission of the Insured, any partner or employee." *Id.* The Aragonas argued *inter alia* that these policy provisions were "ambiguous" and so "must be strictly construed against the insurer, and ... in favor of the policyholder." 281 Md. at 374, 378 A.2d 1346. The Court of Appeals held the exclusion unambiguous: "[w]e see no ambiguity in this language." *Id.* at 375, 378 A.2d 1346. After rejecting the Aragona's remaining argument (an argument not made or applicable here) the Court concluded:

> We think the parties intended, from the language used in the insurance contract construed as a whole, that any loss which resulted from any dishonest or criminal act ... was excluded from coverage, and that the exclusionary clause of the policy was all-encompassing in this respect.

281 Md. at 379, 378 A.2d 1346.

In its very short oral remarks, the court below stated that "there is an ambiguity in the policy." In light of the Court of Appeals's clear holding in *Aragona*, Dr. Azzato disavows any argument that the policy is ambiguous. Instead, he claims that his case "is clearly distinguishable" from *Aragona* because "there is a significant factual difference," *i.e.,* "[h]ere, unlike *Aragona*, there was nothing 'criminal' in

what Dr. Azzato was doing except for the false prescriptions for valium which he wrote in April of 1987, for which he was arrested and subsequently pled guilty." Thus, Dr. Azzato asserts that his distribution of drugs to Mrs. Warsaw on "hundreds" of occasions during the year prior to April, 1987, was not criminal activity. He is wrong. His admitted, frequent distribution to Mrs. Warsaw of drugs that were "controlled dangerous substances," as defined in Art. 27, § 277(f), for "recreational," rather than medicinal, purposes was clearly criminal activity in violation of several provisions of the Maryland Controlled Dangerous Substance Act. *See* Art. 27, § 287(a) and § 288(c). In sum, contrary to Dr. Azzato's assertions, it is just as clear here, as it was in *Aragona,* that the complained-of activity was criminal.

Nor do any of the cases upon which Dr. Azzato relies aid his cause. Many of them do not even involve a determination of insurance coverage. Instead, they simply hold that improper conduct by a health care provider, like Dr. Azzato, can constitute malpractice or professional negligence. *See e.g., Figueiredo–Torres v. Nickel,* 321 Md. 642, 584 A.2d 69 (1991); *Los Alamos Medical Center v. Coe,* 58 N.M. 686, 275 P.2d 175, 178 (1954); *McCarroll v. Reed,* 679 P.2d 851, 854 (Okla.App.1983); *Ballenger v. Crowell,* 38 N.C.App. 50, 247 S.E.2d 287, 291 (1978). Other cases involve insurance policies that contain *no* criminal act exclusion. *See e.g., Public Service Mut. Ins. Co. v. Goldfarb,* 53 N.Y.2d 392, 442 N.Y.S.2d 422, 425 N.E.2d 810, 814 (1981) (only intentional, not criminal, acts excluded from coverage); *Vigilant Ins. Co. v. Kambly,* 114 Mich.App. 683, 319 N.W.2d 382, 384 (1982) (coverage of criminal acts not excluded, only coverage "for legal expense incurred due to alleged criminal act" excluded).

To the extent that the cases relied upon by Dr. Azzato are relevant[2], they indicate that some courts, when confronted

---

**2.** Like the Aragonas, Dr. Azzato also relies on cases involving the obligation of an insurer to provide a defense to the insured, rather than the insurer's obligation to pay under the policy. *See e.g., Snyder*

with similar, but not identical, situations, have concluded that an insurance policy was "ambiguous" because it was unclear whether "it was meant to cover acts ... which constitute ... malpractice but which also are defined as criminal." *See, L.L. v. Medical Protective Co.*, 122 Wis.2d 455, 362 N.W.2d 174, 179 (Wis.App.1984). *See also Graham v. James F. Jackson Associates, Inc.*, 84 N.C.App. 427, 352 S.E.2d 878, 881 (1987) (unclear whether policy, which covered "negligibly inflicted bodily injury" but excludes "criminal acts," covers injuries resulting from involuntary manslaughter). Although, as noted above, Dr. Azzato does not claim that this policy is similarly ambiguous, this seems to be "the ambiguity" that troubled the court below.

In *Aragona*, the Court of Appeals did not address this precise alleged ambiguity. Implicit in the *Aragona* holding, however, is the conclusion that acts can constitute both malpractice and criminal behavior and that a professional liability policy excluding coverage in language like that at issue in *Aragona*—and here—excludes coverage for injuries arising from such acts. This is so because the criminal act in *Aragona*, a lawyer's misappropriation of his client's funds, clearly also constitutes legal malpractice. *See* Maryland Lawyers' Rules of Professional Conduct Rules 1.15 (and 8.4); *Attorney Grievance Comm'n v. White*, 328 Md. 412, 614 A.2d 955 (1992); *Attorney Grievance Comm'n v. Moore*, 301 Md. 169, 170–171, 482 A.2d 497 (1984). If the Court of Appeals had concluded that there was any ambiguity in the policy possibly permitting coverage because this misappropriation also constituted malpractice, its holding would have had to be different. Accordingly, the ambiguity seen by courts in other jurisdictions was *sub silentio* rejected by the *Aragona* court. That result is surely sound. All

---

*v. National Union Fire Ins. Co.*, 688 F.Supp. 932 (S.D.N.Y.1988). As Chief Judge Murphy explained in *Aragona*, "[s]ince the obligation of an insurer to defend its insured is usually determined by the allegations of the suit, these cases are largely inapposite in determining the extent of the insurer's contractual obligation to indemnify its insured." 281 Md. at 380 n. 3, 378 A.2d 1346.

activity that is expressly excluded from coverage in this or any other insurance policy would, at least arguably, be covered if not so excluded. Thus, it would make no sense to interpret this policy to be ambiguous simply because the activity it excludes would, absent the exclusion, be covered.

### (iii)

Even if the criminal activities exclusion would otherwise bar coverage for the judgment obtained by the Warsaws against him, Dr. Azzato claims "Medical Mutual is estopped from raising the criminal activities exclusion." The basis for this argument is the Court of Appeals' recent holding in *Allstate Insurance Co. v. Atwood,* 319 Md. 247, 572 A.2d 154 (1990). There the Court carefully outlined how and when an insurer is to litigate whether acts are tortious and, therefore, covered acts or intentional and, therefore, excluded. It cautioned that declaratory judgment actions to determine this question in advance of the underlying tort trial "should be rare." 319 Md. at 254, 572 A.2d 154. *See Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 347 A.2d 842 (1975). Rather, the insurer is generally "bound by the finding in a tort action against its insured that the insured was liable due to negligence." 319 Md. at 260, 572 A.2d 154. The insurer, however, will be "bound by the tort action's resolution of the intentional/negligence issue if, but only if, that issue was fairly litigated in the tort trial." *Id.* at 261, 572 A.2d 154. In order to determine if this issue was "fairly litigated" in the underlying tort action, the *Atwood* court permitted the insurer in that case to bring a separate declaratory judgment action after the tort judgment became final and remanded so that the trial judge could "first determine whether the intentional/negligence issue was fairly litigated in the tort case." *Id.* at 263, 572 A.2d 154. The Court indicated, however, that in the future, "a separate declaratory judgment action" would not be allowed; rather, in order to determine this coverage issue, the insurer must move to intervene in the tort action "no

later than ten days after entry of judgment" in that action.
*Id.* at 264, 572 A.2d 154.

Dr. Azzato asserts that *Atwood* governs the coverage
question at issue here. He argues that "the issues between
Warsaw and Azzato were fully and fairly litigated by [the]
Health Claims [arbitration panel]," that Medical Mutual,
which was on notice of these claims, did not attempt to
intervene in the Health Claims Arbitration hearing or file a
declaratory judgment action and so should not "be permit-
ted to relitigate" those issues now. The critical difficulty[3]
with this argument is that the procedure outlined in *Atwood*
is simply inapplicable to the present question. The *Atwood*
procedure only applies when the issue to be resolved in the
coverage action is "the same as an issue in the tort action."
*Id.* at 259–263, 572 A.2d 154. Judge Eldridge in *Atwood*
carefully distinguished that situation from cases where
questions of policy coverage "are independent and separa-
ble from the claims asserted in a pending suit by an injured
third party." *Id.* quoting *Brohawn, supra,* 276 Md. at 405,
347 A.2d 842. In the latter situation, the Court of Appeals
has approved the use of a separate action *prior* to a
pending tort action, *see e.g., Northern Assurance Co., v.
EDP Floors,* 311 Md. 217, 533 A.2d 682 (1987) or *after*
resolution of the tort action, *e.g., Aragona, supra,* as gener-
ally appropriate means for determining coverage questions.[4]

---

**3.** Medical Mutual, pointing out that the arbitration award against Dr.
Azzato became final in August, 1989, almost a year prior to the Court
of Appeals' decision in *Atwood* argues that for this reason *Atwood* has
"no bearing on this case." Because of this timing, the requirement
that the insurer intervene within ten days after the entry of judgment
in the tort action would, of course, not be required here. If *Atwood*
governed this case, however, we would have to remand to the circuit
court, as was done in *Atwood* itself, for determination *inter alia* of
whether the coverage issue was "fully and fairly litigated in the tort
case."

**4.** Both *Aragona* and *Northern Assurance* were declaratory judgment
actions. Medical Mutual, however, does not assert that the present
contract action is in any way an inappropriate procedural vehicle.
Although a declaratory judgment action is perhaps the more usual
way to determine coverage question, contract actions have also been

 Here, as in *Northern Assurance* and *Aragona,* the coverage question, *i.e.,* whether the complained of acts were crimes, was clearly "independent and separable" from the claim asserted in the pending tort action, *i.e.,* whether the acts were medical malpractice. Thus, resolution of the tort action did not, and could not, resolve the coverage question. Acts can be held not to constitute malpractice and still be crimes. *See e.g., In Re Meyerson,* 190 Md. 671, 685, 59 A.2d 489 (1948). Acts can be held to constitute malpractice and not be crimes. *See e.g., Aetna Life & Casualty Co., v. McCabe,* 556 F.Supp. 1342, 1352 n. 7 (E.D.Pa.1983). And, as this case demonstrates, acts can be held to constitute both malpractice and crimes. Thus, determination of whether acts are malpractice simply does not resolve the question of whether they are crimes. Since the latter question is independent and separable from the former, the *Atwood* procedure is inapplicable here. Accordingly, Medical Mutual is not "estopped" from raising the criminal act exclusion because of the prior determination by the Health Claims Arbitration panel that the complained of conduct constituted malpractice.

The fundamental principle, which has escaped Dr. Azzato, is that an insured's acts may be held to constitute malpractice making him liable to his patients for injuries resulting from those acts and yet the insured may, nevertheless, be unable to recover from his malpractice insurer because the policy does not cover injuries resulting from those acts. This is the distinction that Chief Judge Murphy pointed to in *Aragona* "between causes of loss for which liability may be imposed upon an insured by law, [all malpractice] and causes of loss for which the insurer may have contracted to be liable [here only non-criminal malpractice]." 281 Md. at 375–76, 378 A.2d 1346. As in *Aragona,* the insured, here Dr. Azzato, is legally liable for damages resulting from his

---

so used. *See e.g., Lane v. Nationwide Mut. Ins. Co.,* 321 Md. 165, 582 A.2d 501 (1990); *Nationwide Mut. Ins. v. Webb,* 291 Md. 721, 436 A.2d 465 (1981).

acts but cannot obtain reimbursement from his insurer, because the insurer did not contract to provide coverage for the damages resulting from those acts.[5]

JUDGMENT REVERSED.

COSTS TO BE PAID BY APPELLEES.

---

5. In view of our holding here, the issue raised in the cross appeal is moot.