ST. PAUL FIRE AND MARINE INSURANCE COMPANY *v.*
ROBERT SHERNOW, D.D.S., ET AL.
(14422)

PETERS, C. J., CALLAHAN, COVELLO, BORDEN and BERDON, Js.

824

Argued February 11—decision released July 14, 1992

*Kenneth J. McDonnell,* for the appellant-appellee (plaintiff).

*William F. Gallagher,* with whom were *Cynthia C. Bott* and, on the brief, *Timothy Moynahan,* for the appellee-appellant (intervening defendant Mary Lou Sciola).

COVELLO, J. The principal issue in this appeal from a declaratory judgment is whether professional liability (malpractice) insurance covers injuries sustained by a patient when a dentist, in the course of treatment, sexually assaulted her, having overcome her ability to resist through misuse of anesthesia. We conclude that the trial court correctly determined that professional liability insurance covered the injuries sustained in this incident and, therefore, affirm the judgment.

The parties agree that the plaintiff, St. Paul Fire and Marine Insurance Company (St. Paul), issued an insur-

ance policy to the named defendant, Robert Shernow, a dentist, that provided both professional liability protection[1] and office liability protection.[2]

On May 12, 1986, the intervening defendant here, Mary Lou Sciola, commenced an action in Superior Court against Shernow for damages and injuries that she had sustained as the result of a sexual assault that allegedly had occurred in the course of dental treatment furnished by Shernow.[3] Sciola's action was

[1] Insuring Agreement No. 42, entitled "Dentists Professional Liability Protection," stated: "Your professional liability protection covers you for damages resulting from: 1. Your providing or withholding of professional services, while this agreement is in effect. . . ."

[2] Insuring Agreement No. 51, entitled "Office Liability Protection," stated: "We'll pay damages you and others protected under this agreement are legally responsible for because of bodily injury, personal injury or damage to other people's property caused by an accidental event."

An accidental event was defined as "something the person protected didn't expect or intend to happen."

Excluded from coverage was "any personal injury that results when you knowingly break any law." Further excluded was "injury or damage caused by the providing or withholding of any professional service."

[3] In reviewing the merits of the appeal that followed, the Appellate Court in *Sciola* v. *Shernow,* 22 Conn. App. 351, 353–55, 577 A.2d 1081, cert. denied, 216 Conn. 815, 580 A.2d 60 (1990), determined that "[t]he jury could reasonably have found the following facts. The defendant had been the plaintiff's dentist for over ten years and had consistently advised her that nitrous oxide was the appropriate means of sedation for her during treatment. On April 19, 1984, the plaintiff visited the defendant's office to have a molar filled. Before beginning any dental work on the plaintiff, the defendant administered nitrous oxide to her. He did this without first checking to see if she was on any medication that would conflict with the nitrous oxide. He also administered a dangerously high concentration of the gas and kept her under its effects more than twice the usual length of time. In addition, the defendant had not checked the accuracy of the machine with which he administered the gas for at least three years.

"When the nitrous oxide had been administered to the plaintiff in the past, she felt mildly dazed, but completely aware of her surroundings. When the nitrous oxide was administered on this occasion she heard a loud ringing noise, felt as if her head was flying up to the ceiling and then lost consciousness. During the course of the one hour and fifteen minutes she was under the effects of the gas she regained consciousness three times. On the first occasion she felt the defendant's tongue in her mouth and experi-

brought in two counts, one for unconsented sexual contact and the other for dental malpractice. On Novem-

enced pain in her breasts. When she attempted to resist the defendant she observed him turning up the concentration of nitrous oxide and again lost consciousness.

"She awoke a second time to find the defendant on top of her. She was having difficulty breathing, the defendant's tongue was in her mouth and she was experiencing pain in her breasts. Once again she attempted to resist the defendant and saw him turn up the gas. The painful ringing returned to her ears and she once again slipped into an unconscious state.

"The third time the plaintiff regained consciousness, she kept her eyes closed so the defendant would not turn up the gas again. At this time, the defendant was still on top of her, and his tongue was in her mouth. She was frightened and felt violently ill. Once the defendant realized that she was awake he assisted her out of the chair. He then approached her from behind, grabbed her breasts and kissed her neck. She was aware that he had an erection at this time. She did not recall any dental work being performed during the entire course of this visit.

"The plaintiff was disoriented when she left the defendant's office. She was nauseated and experienced a burning sensation in her nose, throat, palate and chest. She had a severe headache, her breasts were sore and she felt violated. After she was home, one side of her nose bled periodically.

"Four days after the incident, the plaintiff visited her family physician. She was still suffering from headaches, her breasts were bruised and she was lethargic. The burning sensation in her throat and chest persisted and her nausea continued. She was referred to a pulmonary specialist who concluded that during her excessive exposure to nitrous oxide she had aspirated stomach acid into her lungs which left her with a permanent asthma condition and a permanent loss of 35 to 40 percent of her lung capacity.

"The plaintiff also was seen by a psychiatrist who determined that she suffered from a posttrauma stress disorder. He further concluded that as a result of the events of April 19, 1984, she has a phobia of medical and dental personnel, and suffers from periodic sleeplessness, depression, fearfulness, and heightened anxiety. In addition, her sense of self-reliance, her self-image and her ability to interact effectively with males has been impaired.

"Before this incident, the plaintiff was the lead singer in her own six piece band and a professional entertainer. Since the incident, her income has been significantly reduced due to her diminished lung capacity and endurance.

"After hearing the above evidence, the jury returned a plaintiff's verdict awarding her $300,000 in general damages and $100,000 in punitive damages. The defendant submitted interrogatories to the jury and it responded with the damages that it had assigned to each count. On a separate sheet of paper the jury indicated that it had found a plaintiff's verdict and a total damage award of $400,000."

ber 30, 1988, a jury returned a verdict in Sciola's favor in the amount of $300,000 on the dental malpractice claim. In response to a special interrogatory, the jury specifically found that Shernow "breach[ed] the standard of care in providing professional treatment to [Sciola] . . . ."

In the interim, on December 4, 1987, St. Paul had commenced the present action seeking a determination that its policy did not cover Shernow for the acts alleged by Sciola and that, therefore, it was not liable to indemnify Shernow for any part of the damages that Sciola might be awarded against Shernow. The trial court determined that the professional liability portion of the policy did provide coverage and that the office liability portion of the policy did not. St. Paul appealed to the Appellate Court and Sciola cross appealed. We thereafter transferred the matter to ourselves pursuant to Practice Book § 4023.

On appeal, St. Paul first claims that the evidence disclosed an intentional, sexual attack on Sciola by Shernow; that Shernow rendered Sciola helpless by the administration of excessive amounts of nitrous oxide; and that during the attack, Sciola saw Shernow deliberately turn up the gas twice as she intermittently regained consciousness. St. Paul contends that although the "weapon" or means used to accomplish the sexual assault involved Shernow's negligent use of nitrous oxide, a sedative ordinarily used in the course of his dental practice, this fact should not serve as the basis for characterizing an intentional assault as a professional service that was performed negligently. St. Paul argues that coverage under the professional liability policy should depend upon the nature of the act and the intent of the actor and not the means used to accomplish the act.

In support of this proposition, St. Paul relies upon *Hirst* v. *St. Paul Fire & Marine Ins. Co.,* 106 Idaho 792, 683 P.2d 440 (Idaho App. 1984). In *Hirst,* a physician admitted to drugging and then performing sexual acts on a patient during the course of his examination and treatment of that patient for a sports injury. The physician's professional liability policy was worded exactly the same as the one here. Significantly, the use of the drugs was not related to any treatment for the patient's injuries. Also, there was no showing that the drugs injured the patient. The *Hirst* court concluded that the physician's actions were not covered by the policy. "The scope of "professional services" does not include all forms of a doctor's conduct simply because he is a doctor. As noted by the Supreme Court of Nebraska: 'The insurer's liability is thus limited to the performing or rendering of "professional" acts or services. Something more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind. The term "professional" in the context used in the policy provision means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. [Citations omitted.] In determining whether a particular act is of a professional nature or a "professional service" we must look not to the title or character of the party performing the act, but to the act itself. [Citations omitted.]' *Marx* v. *Hartford Accident and Indemnity Co.,* 157 N.W.2d 870, 871–72 (Neb. 1968)." *Hirst* v. *St. Paul Fire & Marine Ins. Co.,* supra, 796.

For similar reasoning, see also *Smith* v. *St. Paul Fire & Marine Ins. Co.,* 353 N.W.2d 130 (Minn. 1984) (professional liability coverage found unavailable when a physician sexually assaulted teen-age male patients during treatment for various medical problems), and *Standard Fire Ins. Co.* v. *Blakeslee,* 54 Wash. App. 1, 771 P.2d 1172, review denied, 113 Wash. 2d 1017, 781 P.2d 1320 (1989). We conclude that this rationale is inapplicable to the different factual circumstances present in this case.

Shernow had treated Sciola for approximately ten years and had consistently advised her that nitrous oxide was the appropriate means of sedation for her because of her soft teeth. On the day in question, the encounter between Shernow and Sciola began as a dental procedure for the filling of a molar. Prior to beginning treatment, Shernow administered nitrous oxide. Thus, unlike *Hirst,* the drug in issue had a direct relationship to a treatment in progress.

Evidence that Shernow negligently administered the nitrous oxide included, inter alia, the administration of a dangerously high concentration of the gas for more than twice the customary length of time, the failure to check the accuracy of the mechanism that metered out the gas for three years, and the failure to ask Sciola about medications that she might be using before administering the nitrous oxide. Thus, unlike *Hirst,* the jury here heard evidence of specific acts of professional negligence, some of which had occurred prior to the sexual encounter.

Finally, unlike *Hirst,* in which there was no evidence that the drug injured the victim, there was evidence here that the administration of the nitrous oxide permanently injured Sciola. A pulmonary specialist concluded that during her exposure to excessive amounts of nitrous oxide, Sciola aspirated stomach acid into her

lungs, which left her with a permanent asthma condition and a permanent loss of 35 to 40 percent of her lung capacity.

St. Paul also relies on *Standard Fire Ins. Co.* v. *Blakeslee,* supra. In *Standard Fire Ins. Co.,* a dentist administered nitrous oxide to his female patient preparatory to filling two cavities. While she was in a semi-conscious state, the dentist lifted her skirt and also fondled one of her breasts. A divided Washington Court of Appeals concluded that the dentist's professional liability coverage did not extend to these acts as "Blakeslee's administration of nitrous oxide, although admittedly a professional service, cannot be said to be a proximate cause of the injuries alleged . . . ." Id., 11. Although factually similar, the cases are clearly distinguishable when, as here, there was not only evidence of negligent administration of the nitrous oxide, but also direct, physical injury proximately caused by the nitrous oxide itself.

When the medically negligent procedure is so inextricably intertwined and inseparable from the intentional conduct that serves as the basis for the separate claim of a sexual assault, we join with those jurisdictions that conclude that professional liability policies must, in such instances, extend coverage. In *St. Paul Fire & Marine Ins. Co.* v. *Asbury,* 149 Ariz. 565, 720 P.2d 540 (1986), a physician intentionally and improperly manipulated the clitorises of patients during their gynecological examinations. In concluding that the doctor's conduct was committed in the course of and was inseparable from his professional services and that coverage therefore existed, the court agreed with the Arizona trial court that "[t]he question of insurance coverage does not turn on whether the conduct was negligent or intentional, or whether or not there was an assault and battery. Regardless of the category in which the underlying complaints are placed, they

clearly allege tortious conduct while treating the patients, and seek damages resulting from the providing of professional services. Furthermore, the tortious conduct, if it occurred, took place in the course of and as an inseparable part of the providing of professional services. Consequently, any damages would be those resulting from the providing of professional services by the insured." Id., 566; see also *St. Paul Fire & Marine Ins. Co.* v. *Love,* 447 N.W.2d 5 (Minn. App. 1989), aff'd, 459 N.W.2d 698 (Minn. 1990) (professional liability policy covered psychologist's negligence in handling the transference phenomenon, including having sexual relations with the patient); *Zipkin* v. *Freeman,* 436 S.W.2d 753 (Mo. 1968) (professional liability policy covered psychiatrist's mishandling of transference phenomenon which included, inter alia, having sexual relations with the patient); *L.L.* v. *Medical Protective Co.,* 122 Wis. 2d 455, 362 N.W.2d 174 (1984), review denied, 122 Wis. 2d 783, 367 N.W.2d 223 (1985) (professional liability policy covered psychiatrist's performance of sexual acts with the patient, which constituted a claim for malpractice).

Finally, St. Paul argues that the dictates of public policy prohibit the indemnification of Shernow for the consequences of what were his intentional acts. We conclude that the indemnification of Shernow, under these circumstances, does not offend public policy. In *Public Service Mutual Ins. Co.* v. *Goldfarb,* 53 N.Y.2d 392, 425 N.E.2d 810, 442 N.Y.S.2d 422 (1981), a dentist, allegedly, sexually abused a patient during the course of treatment. The professional liability insurance in issue specifically provided coverage for "assault" and "undue familiarity." Despite the clear language of the policy, the carrier argued that the public policy of New York precludes insurance coverage for a claim of sexual abuse in the course of dental treatment. The New York Court of Appeals stated "[w]hether such cover-

age is permissible depends upon whether the insured, in committing his criminal act, intended to cause injury. One who intentionally injures another may not be indemnified for any civil liability thus incurred. However, one whose intentional act causes an unintended injury may be so indemnified." Id., 399. The court concluded that "[w]here [as here,] no finding of an intent to *injure* has been made, nothing in the public policy of this State precludes indemnity for compensatory damages flowing from defendant's volitional act." Id., 400-401.[4]

In *Vigilant Ins. Co.* v. *Kambly,* 114 Mich. App. 683, 319 N.W.2d 382 (1982), a claimant sought the benefit of a psychiatrist's professional liability insurance claiming sexual abuse arising out of a therapeutic relationship. The Michigan Court of Appeals refused to read into the insurance contract a public policy exclusion, concluding that "coverage does not allow the wrongdoer unjustly to benefit from his wrong. It is not the insured who will benefit, but the innocent victim who will be provided compensation for her injuries." Id., 687. We agree with the New York and Michigan courts especially when, as here, indemnification is sought, not for the count alleging sexual assault, but the separate count alleging medical malpractice.

In her cross appeal, Sciola argues that in the event that Shernow is not entitled to indemnification under the professional liability provisions of his policy with St. Paul, Shernow is, nevertheless, entitled to indemnification under the office liability provisions of the policy. In view of our determination that the profes-

---

[4] Public policy, however, clearly prohibits Shernow from receiving indemnity for the $100,000 punitive damages that the jury awarded Sciola in connection with the first count of the complaint that alleged an intentional tort. See *Tedesco* v. *Maryland Casualty Co.,* 127 Conn. 533, 537-38, 18 A.2d 357 (1941).

sional liability coverage is available in this instance, we need not address this alternative issue.

The judgment is affirmed.

In this opinion PETERS, C. J., and BERDON, J., concurred.

BORDEN, J., with whom CALLAHAN, J., joins, dissenting. "It is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom." (Internal quotation marks omitted.) *American National Fire Ins. Co.* v. *Schuss,* 221 Conn. 768, 778, 607 A.2d 418 (1992). It defies common sense to say that, on the facts presented here; see footnote 3 of the majority opinion; Shernow was engaged in "providing . . . professional services." In the past, when Shernow administered nitrous oxide to provide dental services to Sciola, she had been fully aware of her surroundings. On this occasion, however, he administered the gas to Sciola before beginning any dental work, she then lost consciousness, and for the next hour and one quarter he sexually assaulted her, even going so far as to turn up the gas twice when she regained consciousness. The only conclusion that rationally can be drawn from these facts is that Shernow simply used the gas and the occasion for treatment of Sciola as a pretext for satisfying his own sexual desires.

There is nothing in the statement of the facts of this case that indicates that Shernow performed any dental treatment of Sciola. Thus, the statement of the majority, that "the medically negligent procedure is . . . inextricably intertwined and inseparable from the intentional conduct," is without support in this record.

Indeed, the jury in the underlying case against Shernow explicitly concluded as much, by specifically finding, in response to an interrogatory, that he had

"unconsented sexual contact" with Sciola, by explicitly finding that he had intentionally assaulted and battered her, and by rendering a verdict of $100,000 in punitive damages in addition to its award of $300,000 compensatory damages. In the face of these findings, I cannot see how Shernow was "providing . . . professional services" to Sciola. His conduct no more constituted the rendering of professional services than if a lawyer, angry at his client, hit her over the head with volume 24 of Corpus Juris Secundum.

Simply because Shernow used nitrous oxide, ordinarily an appropriate substance when used in the proper dosage and with the proper motivation, and simply because the assault took place in his dental chair, what is plainly a sexual assault is not transformed into the rendering of "professional services." Nor is it pertinent that the jury in the underlying case found that he had breached the standard of reasonable care in his conduct towards Sciola.[1] Of course, intentionally sexually assaulting a patient who is helpless and unconscious in the dental chair is unreasonable conduct for a dentist. That does not mean, however, that the same conduct that rises (or sinks) to the level of such an assault somehow also constitutes insurable "professional services." See *American National Fire Ins. Co. v. Schuss,* supra, 777 (same conduct cannot reasonably be determined to have been both intentionally and negligently tortious).

---

[1] The majority opinion seems to imply that the plaintiff in this case, which was not a party to the underlying case, and which in fact was denied intervention therein, is somehow bound by that finding. Such an implication is contrary to accepted principles of collateral estoppel. See *Eamiello* v. *Liberty Mobile Home Sales, Inc.,* 208 Conn. 620, 634–35, 546 A.2d 805 (1988), appeal dismissed, 489 U.S. 1002, 109 S. Ct. 1104, 103 L. Ed. 2d 169 (1989) (collateral estoppel cannot be used against party who was not party to original litigation). This does not mean, however, that Shernow is not bound by the first jury's findings against him. See *Aetna Casualty & Surety Co. v. Jones,* 220 Conn. 285, 299–303, 596 A.2d 414 (1991) (collateral estoppel can be used offensively against party who was party to first litigation).

I also do not see the relevance of the fact, emphasized by the majority opinion, that in this case, unlike other cases relied on by the plaintiff, there was evidence that the nitrous oxide injured Sciola. Although that might be relevant to a claim of lack of proximate cause, I fail to see how it relates to the issue of whether Shernow's conduct reasonably could be considered to be the rendering of professional services.

Finally, I cannot agree with the majority's approval of the statement of the Michigan Court of Appeals that a result permitting coverage in this case does not offend the public policy against insuring against intentional tortious conduct. The issue here is coverage, not compensation. Contrary to the statement of the Michigan court, it *is* the insured who benefits by this decision, because it is he who is insulated from having to pay Sciola personally the amount of her judgment against him. Moreover, nothing in this record indicates that Shernow cannot pay the judgment against him personally. Finally, engaging in the notion that finding coverage under a policy benefits, not the insured, but the third party claimant in effect eliminates that well established public policy, because it could always be said that it is "not the insured who will benefit, but the innocent victim who will be provided compensation for her injuries."

With regard to the cross appeal, I conclude, for the same reasons, that Shernow's office liability policy did not provide coverage for this intentional sexual assault of Sciola.

I, therefore, dissent.