**ST. PAUL FIRE & MARINE INSURANCE COMPANY, a Minnesota corporation, Plaintiff–Appellee,**

v.

**F.H.; K.W.,\* Defendants–Appellants.**

No. 93–35746.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted August 1, 1994.

Decided May 26, 1995.

---

\* In the interest of victim privacy, the names of defendants-appellants have been abbreviated to initials throughout this opinion.

Sanford M. Gibbs, Anchorage, AK, for plaintiff-appellee.

Michael J. Schneider, Christopher W. Rose, Law Offices of Michael J. Schneider, Anchorage, AK, for defendants-appellants.

Before: PREGERSON, CANBY and BOOCHEVER, Circuit Judges.

CANBY, Circuit Judge:

## I

F.H. and her son K.W. appeal a district court order granting St. Paul Fire and Marine Insurance Company summary judgment in this declaratory judgment action. The district court held that an insurance policy St. Paul issued to Big Brothers and Big Sisters of Alaska (BB/BS) does not provide coverage to BB/BS executive director Kenneth McQuade for damages arising out of McQuade's sexual abuse of K.W. We reverse and remand for further proceedings.

## II

From 1979 until late summer or early fall of 1984, McQuade was executive director of Big Brothers/Big Sisters in Juneau. His duties included supervision of the program in which volunteer "Big Brothers" and "Big Sisters" acted, as their name implies, as ad-visors, role models and confidants of boys and girls who qualified as "Little Brothers" or "Little Sisters." McQuade's duties included: interviewing volunteers and children and their parents to determine whether the volunteers and children met the requirements of the program; matching Big and Little Brothers and Sisters; supervising those matches; and interpreting the general program to the community. McQuade first came into contact with K.W. because K.W.'s siblings were in the program, and he later matched himself to K.W. as K.W.'s Big Brother. Beginning before that match, and continuing until his arrest in 1986, McQuade sexually abused K.W.

In 1986, F.H. brought a civil action in Alaska Superior Court against BB/BS and McQuade, seeking damages for various compensable injuries sustained by F.H. and K.W. Both BB/BS and McQuade tendered defense of the action to BB/BS's insurance carrier, St. Paul. St. Paul accepted BB/BS's tender, but rejected McQuade's. In 1987, the Alaska Superior Court granted BB/BS's motion for partial summary judgment on the ground that it was not liable under the doctrine of *respondeat superior* for McQuade's acts of sexual abuse. Subsequently, F.H. settled her claims against BB/BS and dismissed BB/BS from the litigation.

F.H. later entered into a settlement agreement with McQuade. Under this agreement, McQuade entered confessed judgments of $969,721.25 and $157,650.13 in favor of K.W. and F.H., respectively, and assigned to them any rights he might have had against St. Paul as a result of his sexual abuse liability. In exchange, K.W. and F.H. agreed not to execute against McQuade on the confessed judgments.[1] Following F.H. and K.W.'s settlement with McQuade, St. Paul filed this declaratory judgment action against F.H. and K.W. in the United States District Court, seeking a declaration that McQuade was not an insured under any St. Paul policy, that St. Paul did not provide coverage to McQuade for acts of sexual abuse, that St. Paul did not owe a duty of defense to McQuade, and that

---

1. The validity of the settlement agreement has not been raised as an issue on this appeal, and we express no opinion concerning it.

no rights that McQuade transferred to F.H. and K.W. were enforceable against St. Paul. F.H. and K.W. filed a counterclaim seeking a declaration that McQuade's acts of sexual abuse were covered by St. Paul's insurance policies and seeking damages from St. Paul. St. Paul then moved for summary judgment, and F.H. and K.W. filed a cross-motion for summary judgment.

The district court granted summary judgment in favor of St. Paul, reasoning (1) that it is against Alaska's public policy to permit a person to be insured against a claim of sexual abuse, and (2) that although the policy permitted coverage of executive employees where the claim was for a violation of law, the policy did not protect executive employees for non-accidental injuries, particularly where their intentional act causes the injury.

F.H. and K.W. appeal the district court's judgment. They contend that they are entitled to a declaration that St. Paul had a duty to defend and indemnify McQuade under the professional liability policy it sold to BB/BS.

■ We review *de novo* a district court's grant of summary judgment. *Jesinger v. Nevada Federal Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Botefur v. City of Eagle Point*, 7 F.3d 152, 154 (9th Cir. 1993).

### III

■ During the relevant period, St. Paul insured BB/BS under two policies, a general liability policy and a professional liability policy. It is the professional liability policy that is in issue here. That policy contained a section entitled "Who's Protected Under This Agreement." It stated, in pertinent part:

The named insured shall include any individual or organization named in the Coverage Summary [*i.e.*, BB/BS]. *It also includes any partner, executive officer, director, stockholder or employee working for you within the scope of their duties.*

This policy also includes each volunteer big brother and big sister individually as additional insureds for claims arising from accidental events that were neither expected nor intended by the individual volunteer big brother or big sister and occurring as a result of their activities as volunteer big brothers and big sisters. *There is no coverage for the individual big brother and big sister if the event is in violation of any Federal, State, or Local law. This specific exclusion does not apply to the other insureds named in this agreement.*

(Emphasis added).

St. Paul contends that these provisions are unambiguously intended to exclude coverage of volunteer Big Brothers and Sisters for criminal acts, but to protect BB/BS and its directors and employees from any liability that might accrue to them because of the criminal acts of volunteers. These provisions may indeed have that effect, but they do not in terms limit themselves to that application. They do not say that employees are protected from liability for criminal acts of *others*. They say that the exclusion for criminal acts does not apply to employees of BB/BS like McQuade. And in this case, unlike the example that forms the basis of St. Paul's argument, McQuade was an employee when he met K.W., interviewed and matched him, and for most of the time that he was K.W.'s Big Brother. By its plain language, the exclusion for criminal acts simply does not apply to McQuade as an employee of BB/BS.

There is no question what kind of criminal acts the parties had in mind when they entered the professional liability insurance agreement. The policy was marketed as part of a special package designed for Big Brother/Big Sister organizations by St. Paul and marketed through its agent Jack L. Kirby. In his memorandum describing the policy, Kirby stated:

Most of you are aware of the growing number of lawsuits alleging child molesting being brought against the Big Brother/Big Sister agencies and their officers and directors. . . .

\*      \*      \*      \*      \*      \*

Professional liability insurance with general liability insurance is the only certain method of insuring against child molesting claims. Regardless of how the suit is filed and what allegations are made, the combination of those two policies will ensure proper coverage.

The insureds in the general liability and professional liability policy are:

1. The agency.
2. The officers and directors.
3. The employees of the agency.
4. The Big Brother/Big Sister volunteer, but they are not covered for illegal acts. The other insureds *do* have coverage for illegal acts.

\* \* \* \* \* \*

(Emphasis in original).

In interpreting the policy, we must look both to the policy's language and to Kirby's representations of the policy coverage. *INA Life Ins. Co. v. Brundin*, 533 P.2d 236, 242 (Alaska 1975). From the terms of the policy and the description in Kirby's marketing memorandum, an employee in McQuade's position had every right to expect that he was not excluded from coverage for criminal acts. *See Serradell v. Hartford Accident & Indem. Co.*, 843 P.2d 639, 641 (Alaska 1992) (policy covers if a lay person in a lay interpretation would have reasonably expected it to provide coverage). The policy and the memorandum say as much. There is no exclusion, as there was in *Allstate Ins. Co. v. Roelfs*, 698 F.Supp. 815, 820 (D.Alaska 1987), for liability arising from intentional acts. Quite the contrary, employees are explicitly not excluded from coverage for illegal acts, and it is clear that sexual abuse was the illegal act primarily in contemplation of the parties. Even if there were doubt, the most that could be said is that the policy terms were ambiguous. In that case, they must be construed against the insurer. *U.S. Fire Ins. Co. v. Colver*, 600 P.2d 1, 3 (Alaska 1979); *Bering Strait School Dist. v. RLI Ins. Co.*, 873 P.2d 1292, 1295 (Alaska 1994).

## IV

The district court's order was also based on the court's belief that Alaska's pub-

lic policy would not allow McQuade to be insured for a claim of sexual molestation. In support of this proposition, the court cited *Allstate Ins. Co. v. Roelfs*, 698 F.Supp. at 820–21, n. 6. However, *Roelfs* supports only the proposition that, under Alaska law, where an insurance policy contains an explicit exclusion for bodily injury intentionally caused by an insured, intent to cause injury can be inferred as a matter of law from an act of sexual assault. *Id.* at 820. St. Paul's policy does not contain an exclusion for bodily injury intentionally caused by an insured, and thus *Roelfs* does not apply.

It is true, as St. Paul argues, that Alaska recognizes a general public policy against insuring a person against liability for his or her intentional acts. *See Dairy Queen v. Travelers Indem. Co.*, 748 P.2d 1169, 1172 (Alaska 1988) (principles of public policy deny insured right to recover when he or she intentionally sets fire to property); *see also* Couch on Insurance 2d (Rev. ed.) § 39.15 (1985). To this principle, however, there is an exception that the Alaska courts have not yet addressed. Several courts have held that, when liability insurance is designed to compensate innocent third parties for injuries caused by the intentional misconduct of insureds, it may indemnify without violating public policy. This exception is particularly applicable where it is unlikely that insurance coverage induced the insured to engage in misconduct.

For example, in *Vigilant Ins. Co. v. Kambly*, 114 Mich.App. 683, 319 N.W.2d 382 (1982), a Michigan court of appeals held that a doctor's professional liability insurance policy covered payment of damages to a patient whom the doctor had sexually abused. The court reasoned that "it is unlikely that the insured was induced to engage in the unlawful conduct by reliance upon the insurability of any claims arising therefrom or that allowing insurance coverage here would induce future similar unlawful conduct by practitioners." *Id.* 319 N.W.2d at 385. The prime advantage of coverage is that the innocent victim will be compensated. *See id.*

A number of courts have agreed with the reasoning of *Kambly* and have held that

public policy permits innocent victims of insureds' intentional misconduct to be compensated by the insureds' professional liability policies. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Jacobson,* 826 F.Supp. 155, 164–65 (E.D.Va.1993) (public policy does not forbid patients from being compensated by doctor's professional liability policy for doctor's intentional insemination of them with his own sperm), *aff'd,* 48 F.3d 778 (4th Cir.1995); *St. Paul Fire & Marine Ins. Co. v. Shernow,* 222 Conn. 823, 610 A.2d 1281, 1285–86 (1992) (public policy does not prohibit indemnity for compensatory damages flowing from dentist's intentional sexual assault of patient); *St. Paul Fire & Marine Ins. Co. v. Asbury,* 149 Ariz. 565, 720 P.2d 540, 542 (App.1986) (because Arizona public policy favors compensating injured persons, victims of doctor's sexual abuse can be compensated through his professional liability policy).

The reasoning of *Kambly* and its progeny is applicable in this case. St. Paul's policy was clearly designed to compensate victims of sexual abuse, and to indemnify for such liability. It is unlikely that the availability of insurance coverage induced McQuade sexually to abuse K.W. He faced disgrace and severe criminal penalties as illustrated by his conviction and substantial prison sentence. It is equally unlikely that other professionals will be induced to commit sexual abuse if we allow coverage for sexual abuse here. Public policy concerns against allowing McQuade to avoid civil liability by reason of insurance coverage are outweighed by the advantages of assuring that his victim, K.W., will be compensated for the injuries McQuade caused. While no Alaska case addresses compensation of innocent third parties in this specific situation, the Alaska Supreme Court in a different context has permitted insurance to compensate an innocent victim for an injury intentionally caused by an insured. *See Atlas Assurance Co. of America v. Mistic,* 822 P.2d 897, 899–900 (Alaska 1991) (when insured intentionally burned down his own house, innocent coinsured allowed to collect her half of proceeds). We conclude that the Alaska Court would similarly permit compensation of the victims here. Alaska public policy, therefore, does not prohibit K.W. and F.H. from being compensated un-

der the St. Paul policy for injuries caused by McQuade's sexual abuse of K.W.

## V

█ St. Paul argues, however, that even if McQuade is not excluded from coverage because the injuries arose from his own acts of sexual abuse, he still does not qualify under the policy as an insured with regard to those acts. The coverage section of the policy provides that the named insured "includes any ... executive officer, ... or employee working for you *within the scope of their duties.*" (Emphasis added). St. Paul argues that sexual abuse cannot possibly have been within the scope of McQuade's duties.

We do not view the scope of duties that narrowly, however. The phrase is not further defined in the policy, and a reasonable insured could expect it to cover him for liability arising out of the functions of his employment, even though the ultimate acts causing injury were personal. Several activities of McQuade led to the injury. He met K.W. in the course of his duties, and the relationship clearly began as a result of McQuade's exercise of his duties as executive director of BB/BS. He interviewed K.W. and was responsible for placing him in a Big Brother–Little Brother relationship. McQuade certainly had a duty within the scope of his employment to place K.W. with someone other than a pedophile. He also had a duty to screen potential Big Brothers. The fact that McQuade placed K.W. with himself was a cause of the abuse that followed. Indeed, even acting as a Big Brother easily fits within the scope of McQuade's duties. One of his explicit functions as executive director was to interpret the BB/BS program to the community. It hardly exceeds the scope of that duty for McQuade to be an example and serve as a Big Brother himself. And his duty in that Big Brother relationship is to guide and nurture K.W., not to abuse him. Thus there were several failures of McQuade, committed in the scope of his employment, that acted as causes of the abuse of K.W.

St. Paul argues that the third amended complaint of F.H. and K.W. is a transparent

attempt to allege negligent failure of employment duties when the real damage was intentional. But this fact does not alter the analysis. There is no exclusion in the policy from coverage for intentional acts. There is an exclusion for criminal acts, but employees like McQuade are explicitly excepted from that exclusion. One reasonable gloss that an insured may put on that exception for employees is that there must be some criminal acts committed in the scope of their employment duties for which the employees are covered. Thus the fact that McQuade's failures properly to place K.W., to supervise that placement, to screen K.W.'s Big Brother, and to guide K.W. as a Little Brother, were intentional does not operate to exclude them from coverage.

We conclude, therefore, that McQuade committed several acts within the scope of his employment that caused the ultimate abuse of K.W. Those acts fell within the coverage specified by the policy for employees of BB/BS, and were not excluded by the clause relating to criminal acts.

## VI

Finally, St. Paul argues that F.H. and K.W. are collaterally estopped by a ruling of the Alaska Superior Court from arguing that McQuade's acts of sexual abuse occurred within the scope of his duties as executive director of BB/BS. The ruling in question is the Superior Court's partial summary judgment in favor of BB/BS, holding that BB/BS was not liable to F.H. and K.W. on a theory of *respondeat superior.*

We conclude that F.H. and K.W. are not collaterally estopped. The partial summary judgment was not a final judgment. As a partial summary judgment, it could not have been appealed by F.H. and K.W. when it was entered. It was subject to reconsideration on proper motion. Alaska Civil Rule 54(b). The partial summary judgment, of course, would have become a final and appealable order if the litigation had gone to final judg-

ment, but settlement intervened. We cannot say that the ruling was " 'sufficiently firm to be accorded conclusive effect.' " *Briggs v. State Dep't of Public Safety,* 732 P.2d 1078, 1082 (Alaska 1987) (*quoting* Restatement (Second) of Judgments § 13 (1982)). We do not view the partial summary judgment on the same plane with the exhaustive decision, after full trial, given collateral estoppel effect in *Borg–Warner v. Avco Corp.,* 850 P.2d 628 (Alaska 1993). *Borg–Warner* relied on *Chemetron Corp. v. Business Funds, Inc.,* 682 F.2d 1149, 1190–92 (5th Cir.1982), another fully-tried case in which the court gave effect to the judgment despite the fact that the ministerial act of entry had not occurred. The Superior Court's ruling in this case never approached that stage. The court could, on its own initiative, revise the order at any time before judgment.[2]

We conclude, therefore, that F.H. and K.W. are not collaterally estopped from asserting that McQuade's actions within the scope of his duties as executive director of BB/BS caused their compensable injuries.

## VII

Because BB/BS's professional liability policy may be construed by a reasonable insured to create an expectation that it provides coverage for claims arising from McQuade's sexual abuse of K.W., we conclude that it does provide such coverage. We also hold that Alaska public policy does not prohibit that coverage in the circumstances of this case. St. Paul had a duty to defend and indemnify McQuade under the circumstances of this case. We therefor reverse the district court's summary judgment in favor of St. Paul, and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

2. *See also Luben Industries, Inc. v. United States,* 707 F.2d 1037, 1040 (9th Cir.1983) (district court did not abuse its discretion in determining that non-appealable interlocutory opinion that was subject to revision upon proper motion did not have collateral estoppel effect); *Avondale Shipyards, Inc. v. Insured Lloyd's,* 786 F.2d 1265, 1269–72 (5th Cir.1986) (interlocutory order granting partial summary judgment that was non-appealable and subject to revision did not have collateral estoppel effect); *Aetna Casualty & Surety Co. v. Fairchild,* 620 F.Supp. 1245, 1249 (D.C.Idaho 1985) (because a state court's entry of partial summary judgment is open to review and non-appealable, it does not have collateral estoppel effect).