440 F.3d 86
 NORTHFIELD INSURANCE CO., Plaintiff-Appellee,
The Northern Insurance Company of New York, Third-Party-Defendant-Appellee,
v.
DERMA CLINIC INC. and Patricia O'Regan Brown, Defendants-Third-Party-Plaintiffs-Appellants,
Holly Allen, Jane Doe and Mary Roe, Defendants-Appellants,
Joseph Burden, Defendant.
 Docket No. 04-2056-CV(L).
 Docket No. 04-2057-CV(CON).
 United States Court of Appeals, Second Circuit.
 Argued: June 22, 2005.
 Decided: March 6, 2006.
 
 Mark J. Kovack, Wake, See, Dimes & Bryniczka, Westport, Connecticut, for Defendants-Third-Party-Plaintiffs-Appellants.
 Kathryn Emmett, Emmett & Glander (Christine Caulfield on the brief), Stamford, Connecticut, for Defendants-Appellants.
 Ralph W. Johnson, Halloran & Sage, LLP (James V. Somers, John W. Lemega, and Regen O'Malley on the brief), Hartford, Connecticut, for Plaintiff-Appellee.
 Linda L. Morkan, Robinson & Cole LLP (Rhonda J. Tobin and Jeffrey J. White on the brief), Hartford, Connecticut, for Third-Party-Defendant-Appellee.
 Before: WINTER, POOLER, and SOTOMAYOR, Circuit Judges.
 WINTER, Circuit Judge.
 
 
 1
 Defendants Derma Clinic, Inc. ("Derma"), Patricia O'Regan Brown, and plaintiffs Holly Allen, Jane Doe, and Mary Roe appeal from Judge Burns's grant of summary judgment in favor of Northfield Insurance Company ("Northfield") and Northern Insurance Company of New York ("NIC"). Judge Burns's decision denied coverage to Derma and Brown under a professional liability policy ("PL Policy") issued by Northfield and a portfolio policy ("NIC Policy") issued by NIC, which included commercial general liability coverage ("CGL part").[1]
 
 
 2
 Appellants raise undecided but dispositive questions of Connecticut law. These issues require the interpretation of Connecticut insurance and contract law, and we certify, pursuant to Conn. Gen Stat. § 51-199b (2005) and 2d Cir. R. § 0.27, several questions to the Supreme Court of Connecticut.
 
 BACKGROUND
 
 3
 a) The Underlying Lawsuits
 
 
 4
 Derma Clinic is a business offering massage therapy to the public. At all pertinent times, Brown was president of Derma, and Joseph Burden was an employee of Derma and Brown. Between August 2001 and September 2002, three women—Allen, Doe, and Roe—filed lawsuits against Derma, Brown, and Burden. Each complaint alleged a physical and sexual assault that occurred during the course of a massage performed by Burden.
 
 
 5
 The first count of the Allen complaint alleged assault and battery against Burden only. The Second Count alleged that Burden intentionally inflicted emotional distress against Allen. Count Three alleged that Derma negligently breached its obligations to Allen by failing to advise Allen that Derma had received complaints concerning Burden's improper behavior; failing to investigate promptly these complaints; failing to suspend Burden pending an investigation of the complaints; failing to terminate Burden; continuing to allow Burden to perform massages after it knew or should have known Burden was sexually abusing patrons; and failing to report Burden to the appropriate licensing organization. The Fourth Count made the same allegations as the Third Count but characterized Derma's acts and omissions as "willful, wanton, reckless, intentional and/or deliberate disregard for the safety and the well being" of Allen. Count Five asserted a claim for negligent infliction of emotional distress by Derma. Id.
 
 
 6
 Count One of the Doe suit alleged physical and sexual assault by Burden only. The second count alleged that Derma and Brown negligently caused the physical and sexual assault because they knew or should have known of Burden's propensity to assault clients but did nothing to protect Doe; failed to warn Doe; failed to adequately supervise Burden; and failed to monitor Burden. Count Three alleged violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. §§ 42-110a to p, based on Derma and Brown's failure to warn or protect Doe from Burden despite Derma and Brown's awareness of Burden's propensity to assault clients.
 
 
 7
 Count One of the Roe complaint alleged physical and sexual assault. It charged that Derma and Brown failed to investigate Roe's claim and continued to employ Burden after receiving a report that Burden had sexually assaulted a previous patron. Count One also claimed that Brown sought to publicly discredit Roe by making statements to the press of her disbelief of the allegations against Burden. Count Two alleged negligence against Derma and Brown because they knew or should have known about Burden's propensity to have sexual contact with and/or assault clients and failed to protect Roe; failed to provide adequate safeguards to clients receiving massages; failed to adequately train, supervise, and monitor Burden; and retained Burden despite his propensity to have sexual contact with and/or assault his clients. Count Three alleged intentional infliction of emotional distress by Derma, Brown, and Burden, whereas Count Four alleged negligent infliction of emotional distress by the same defendants. Count Five alleged an invasion of privacy, and Count Six alleged violations of CUTPA based on Derma and Brown's failure to warn or protect Roe from Burden despite Derma and Brown's awareness of Burden's propensity to have sexual contact with and/or assault clients.
 
 
 8
 b) The Insurance Policies
 
 
 9
 Derma and Brown rely on two insurance policies to cover their defense against the claims by Allen, Doe, and Roe and, if necessary, to provide indemnification. The first policy, a professional liability policy ("PL Policy"), was issued by Northfield and designates Derma as the named insured. Derma's "`executive officers' and directors" are also insureds, "but only with respect to their duties as [Derma's] officers and directors." The PL Policy provides coverage for "those sums that the insured becomes legally obligated to pay as damages because of a negligent act, error or omission in the rendering of or failure to render professional services of the type described in the Declarations." The Declarations page describes Derma's business as "massage therapist." The PL Policy further states that Northfield has "the right and duty to defend the insured against any `suit' seeking those `damages.'" The PL Policy excludes coverage for "[a]ny damages arising out of any dishonest, fraudulent, criminal or malicious act or omission of any insured or `employee.'"
 
 
 10
 Derma and Brown also rely upon the commercial general liability (CGL) Part of the policy underwritten by NIC. Derma is the named insured on the CGL Part, and Brown, in her capacity as president of Derma, is also an insured. The CGL Part obligates NIC to "pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies" and to "defend any `suit' seeking those damages." "Bodily injury" is defined under the CGL Part as "bodily injury, sickness or disease sustained by a person. This includes mental anguish, mental injury, shock, fright or death resulting from bodily injury, sickness or disease." The CGL Part excludes coverage for bodily injury expected or intended by the insured, and "`[b]odily injury' ... arising out of the rendering or failure to render any professional service, including but not limited to ... (b) ... massage."
 
 
 11
 c) Proceedings in the District Court
 
 
 12
 Northfield and NIC initiated declaratory judgment actions in the District of Connecticut seeking a determination that their insurance policies do not obligate them to defend or indemnify Derma or Brown in connection with the Allen, Doe, and Roe suits. The district court granted both Northfield's and NIC's motions for summary judgment.
 
 
 13
 With regard to the Northfield policy, the district court refused to "torture the meaning of `professional services' to include sexually assaulting a client in the guise of massaging her." Reasoning that "the natural meaning of the term `professional services' includes massaging clients only," the court found that the PL Policy, which insures damages only against negligence in the rendering or omission of professional services, did not cover the acts alleged in the Allen, Doe, and Roe complaints.
 
 
 14
 The district court also denied coverage to Derma and Brown under the PL Policy because of the policy's criminal acts exclusion, which disallows coverage for "[a]ny damages arising out of any dishonest, fraudulent, criminal or malicious act or omission of any insured or `employee.'" Under the district court's reading of the term "arising out of," coverage could not exist for the negligence claims against Derma and Brown because these claims were derived from the same factual circumstances as the sexual assault.
 
 
 15
 Finally, the district court held that Burden's nolo contendere plea and the resulting conviction triggered the criminal acts exclusion in the PL Policy. "[W]here a declaratory judgment action is brought seeking the enforcement of a contractual provision, a judgment of conviction is conclusive of the insured's guilt." (emphasis in original) (citation omitted). The court found that a conviction based on a plea of nolo contendere is admissible in disputes contesting coverage under a criminal acts exclusion, and noted that "`the conviction cannot be disregarded as if it did not happen.'" (quoting Allstate Ins. Co. v. Simansky, 45 Conn.Super. Ct. 623, 629 (1998)).
 
 
 16
 The district court also granted summary judgment in favor of NIC. Adopting the reasoning of its decision for Northfield, the district court granted NIC's motion for summary judgment on the grounds that the NIC Policy contains an exclusion for bodily injury "arising out of the rendering or failure to render professional services, including . . . massage" and a criminal acts exclusion with language virtually identical to that of the PL Policy.
 
 DISCUSSION
 
 17
 Because this action is based solely on diversity jurisdiction, whether Derma and Brown are covered under the PL Policy and/or the NIC Policy is a question entirely dependent on the construction and interpretation of Connecticut law. Moore v. Cont'l Cas. Co., 252 Conn. 405, 746 A.2d 1252, 1254 (2000) (finding that construction of an insurance policy presents a question of law).
 
 
 18
 "`Certification is a discretionary device, both for the certifying court and for the court requested to answer the certified question[s].'" McCarthy v. Olin Corp., 119 F.3d 148, 153 (2d Cir.1997) (citation and internal quotation marks omitted). Local Rule § 0.27 permits certification "to the highest court of a state an unsettled and significant question of state law that will control the outcome of a case pending before this Court." 2d Cir. R. § 0.27. Reciprocally, the Supreme Court of Connecticut "may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state." Conn. Gen.Stat. § 51-199b(d) (2005). As permitted by Conn. Gen.Stat. § 51-199b(d) and 2d Cir. R. § 0.27, we respectfully request that the Supreme Court of Connecticut address the following questions:
 
 
 19
 (1) In a policy with multiple coverage parts like the NIC Policy, does a criminal acts exclusion in the Commercial Crime Coverage Form apply to disputes arising under the Commercial General Liability Form?
 
 
 20
 (2) Can Burden's plea of nolo contendere and the resulting conviction be used to trigger an insurance policy's criminal acts exclusion?
 
 
 21
 (3) When applied to the business of massage therapy, does the term "professional services" include acts ancillary to the business of massage therapist, e.g., the investigating, training, monitoring, supervising of masseurs?
 
 
 22
 (4) Under the language of the NIC Policy, do the negligence claims against Derma and Brown arise out of the rendering of professional services when the underlying acts involve physical and sexual assaults during the performance of a massage?
 
 
 23
 We address the need for answers to these questions seriatim.
 
 
 24
 1. In a policy with multiple coverage parts like the NIC Policy, does a criminal acts exclusion in the Commercial Crime Coverage Form apply to disputes arising under the Commercial General Liability Form?
 
 
 25
 Derma and Brown are insured under NIC's policy, which is composed of five different Sections and Coverage Parts. The first section is the Common Policy Conditions, which includes declarations applicable to all Coverage Parts. Next are the Commercial Property Coverage Part, the Commercial General Liability Coverage Part, the Commercial Umbrella Coverage Part, and the Forms and Endorsements Applicable.
 
 
 26
 The dispute in this case has focused on the Commercial General Liability Form ("CGLF"), which falls under the Commercial General Liability Coverage Part. NIC contends that the criminal acts exclusion in the Commercial Crime Coverage Form ("CCCF") modifies the coverage provided under the CGLF.[2] In support of that position, NIC cites language in the CCCF that states, "Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered."
 
 
 27
 Derma and Brown contend that the criminal acts exclusion in the CCCF does not apply to the claims made by Allen, Doe, and Roe because these claims involve coverage provided in the CGLF, which, Derma and Brown argue, is distinct and independent from the CCCF. Derma notes in that regard that the CCCF insures against "[l]oss of, and direct loss from damage to, `money,' `securities' and `property other than money and securities' resulting directly from employee dishonesty," whereas the CGLF covers damages resulting from bodily injury and property damage. The CCCF further enumerates coverage for claims based on forgery, money orders, counterfeit currency, and unauthorized business card use. Derma and Brown argue that these kinds of claims are completely unrelated to the claims at issue in this suit.
 
 
 28
 The applicability of the CCCF's criminal acts exclusion to the CGLF is extremely important to the resolution of this case. Because the CGLF contains no criminal acts exclusion in and of itself, whether the exclusion from the CCCF applies to the CGLF may be dispositive of the question of coverage under the NIC Policy.
 
 
 29
 2. Can Burden's plea of nolo contendere and the resulting conviction be used to trigger an insurance policy's criminal acts exclusion?
 
 
 30
 Under Connecticut law, "a prior plea of nolo contendere and a conviction based thereon may not be admitted into evidence in a subsequent civil action or administrative proceeding to establish either an admission of guilt or the fact of criminal conduct." Town of Groton v. United Steelworkers of Am., 254 Conn. 35, 757 A.2d 501, 511 (2000). Convictions following a plea of nolo contendere may not be used against the defendant as an admission in a subsequent criminal proceeding either. Id. at 510 (citations omitted). Furthermore, convictions based on nolo contendere pleas are not admissible "`as res judicata establishing that the plaintiff was engaged in a criminal act,'" id. at 511 (quoting Lawrence v. Kozlowski, 171 Conn. 705, 372 A.2d 110, 115 n. 4 (1976)), to affect the plaintiff's credibility, id. (citing Krowka v. Colt Patent Fire Arm Mfg. Co., 125 Conn. 705, 8 A.2d 5, 9 (1939)), or as evidence of acknowledged tortious conduct. Burrell v. United States, 384 F.3d 22, 30 (2d Cir.2004).
 
 
 31
 The Court in Town of Groton noted, however, that there are some areas of law where public policy might require the consequences of a nolo contendere plea to be more severe. Town of Groton, 757 A.2d at 512 (holding that "[t]herefore, although our jurisprudence traditionally has imposed limitations on the collateral effects to be given, in the civil and administrative litigation contexts, to a conviction based on a nolo plea, the private nature of voluntary arbitration strongly counsels against extending those limitations to the employment sphere governed by a voluntary arbitration clause."); see also State v. Daniels, 248 Conn. 64, 726 A.2d 520, 524 (1999) ("We recognize that the defendant's conviction based on his Alford plea would establish a violation of the conditions of the defendant's probation."), overruled in part on other grounds by State v. Singleton, 274 Conn. 426, 876 A.2d 1 (2005); Godin v. Godin, FA93 53345, 1995 WL 491420, at *2 (Conn.Super.Ct. Aug. 8, 1995) (noting, for purposes of child custody order, that the "fact that [the father] entered `[A]lford' pleas to these [sexual assault] charges does not alter the fact of conviction").
 
 
 32
 One Connecticut case, Allstate Insurance Co v. Simansky, addressed the effect of a prior plea of nolo contendere on the operation of an insurance policy's criminal acts exclusion. 45 Conn.Supp. 623, 738 A.2d 231 (1998). "`A judgment of conviction is conclusive evidence of the insured's guilt. . . . Although a conviction may or may not be conclusive evidence of the underlying facts, it is to be accorded preclusive effect with respect to the insured's commission of the crime.'" Id. at 233-34 (emphasis supplied) (quoting Allstate Ins. Co. v. Schmitt, 238 N.J.Super. 619, 570 A.2d 488, 495 (1990)). Simansky, therefore, allows nolo contendere pleas to serve as evidence of the commission of a crime in civil matters that involve "the enforcement of a contractual provision in an insurance policy." Id. at 234. Thus, under Simansky, when a criminal act exclusion is at issue, "[t]he fact of the conviction has a collateral legal consequence on the enforcement of the policy exclusion. For purposes of the exclusion, the conviction cannot be disregarded as if it did not happen. It did happen, and in so happening triggered the exclusion." Id. at 235. However, Simansky relied on Sokoloff v. Saxbe, 501 F.2d 571 (2d Cir.1974), Simansky, 738 A.2d at 235, and the Supreme Court of Connecticut has specifically noted that it does not wholly subscribe to the majority view expressed in Sokoloff. Town of Groton, 757 A.2d at 511 n. 13.[3]
 
 
 33
 Given this state of the law, we think the Supreme Court of Connecticut should decide whether a plea of nolo contendere and the resulting conviction can be used to trigger a criminal acts exclusion in an insurance policy.
 
 
 34
 3. When applied to the business of massage therapy, does the term "professional services" include acts ancillary to the business of massage therapist, e.g., the investigating, training, monitoring, supervising of masseurs?
 
 
 35
 The PL Policy insures against claims of a "negligent act, error or omission in the rendering of or failure to render professional services." The PL Policy describes the business of Derma as being that of a "massage therapist." The PL Policy, however, also contains a separation of insureds clause. "[T]his insurance applies: 1. As if each Named Insured were the only Named Insured; and 2. Separately to each insured against whom claim is made or `suit' is brought."). Such a clause requires that the claims against each insured be analyzed from the perspective of that particular insured. Sacharko v. Ctr. Equities Ltd. P'ship, 2 Conn.App. 439, 479 A.2d 1219, 1222 (1984) (stating that "[w]here a policy contains a severability of interests clause, it is a recognition by the insurer that it has a separate and distinct obligation to each insured under the policy."); see also Elec. Ins. v. Castrovinci, No. 3-02-CV-1706 (WWE), 2003 WL 23109149, at *3 (D.Conn. Dec.10, 2003) (explaining that a separation of insureds clause evinces an intention that "the terms of [the insurance policy] apply separately to each insured").
 
 
 36
 We therefore analyze Allen, Doe, and Roe's claims from the perspective of Derma and Brown. Those claims assert that Derma and Brown should have engaged in certain prophylactic acts, e.g., training, monitoring, supervising, protecting. If those acts, in and of themselves, constitute professional services in the rendering of massage therapy, then the PL Policy covers the negligence claims related to these services. Moreover, if, under Connecticut law, these services are professional services necessary to the business of massage therapy, then the claims against Derma and Brown involve negligence in the rendering of professional services and are covered by the PL Policy.
 
 
 37
 Because the term "professional services" as used in the PL Policy is ambiguous in the present context and there is no binding or dispositive Connecticut precedent, it is appropriate for us to seek the guidance of the Supreme Court of Connecticut.
 
 
 38
 4. Under the language of the NIC Policy, do the negligence claims against Derma and Brown arise out of the rendering of professional services when the underlying acts involve physical and sexual assaults during the performance of a massage?
 
 
 39
 Also essential to the disposition of this case is an interpretation of the NIC Policy's professional services exclusion. Specifically, the CGL Part of the NIC Policy excludes coverage for "`bodily injury' or `property damage' arising out of the rendering or failure to render any professional service, including but not limited to . . . massage." "[T]he term `arising out of' is very broad." QSP, Inc. v. Aetna Cas. & Sur. Co., 256 Conn. 343, 773 A.2d 906, 926 (2001). "[I]t is generally understood that for liability for an accident or an injury to be said to `arise out of' [an occurrence], it is sufficient to show only that the accident or injury `was connected with,' `had its origins in,' `grew out of,' `flowed from,' or `was incident to' [that occurrence], in order to meet the requirement that there be a causal relationship between the accident or injury and [the occurrence]." Hogle v. Hogle, 167 Conn. 572, 356 A.2d 172, 174 (1975).
 
 
 40
 Because "arising out of" is generally construed broadly, NIC argues that it is inconceivable that the negligence claims against Derma and Brown did not arise out of the rendering of a professional service, the massages performed by Burden. In fact, the court in Mt. Vernon Fire Insurance v. Morris adopted this reasoning. No. CV020173643S, 2004 WL 1730133, at *9-10 (Conn.Super.Ct. July 1, 2004). Discussing a policy exclusion for assault and battery, the court held that "[h]ere, `but for' [the] sexual assault and battery upon John Doe, the claims against [the insureds], including the claims for negligence, false imprisonment and violation of CUTPA, would not exist. The exclusion, therefore, precludes coverage for all the claims against [the insureds], as a matter of law." Morris, 2004 WL 1730133, at *10; see also Old Republic Ins. v. Comprehensive Health Care Assocs., Inc., 786 F.Supp. 629, 632 (N.D.Tex.1992) (finding that "[w]ithout the underlying sexual harassment there would have been no injury and obviously, no basis for a suit against [the employer] for negligence."); Commercial Union Ins. Co. v. Sky, Inc., 810 F.Supp. 249, 255 (W.D.Ark.1992) (finding that "[w]ithout the underlying sexual harassment claim there would have been no alleged `personal injury' and no basis for a suit against [the employer] for . . . negligent supervision."). But see U.S. Fid. & Guar. Co. v. Open Sesame Child Care Ctr., 819 F.Supp. 756, 760 (N.D.Ill.1993) (stating that "[i]n refusing to separate the employer's alleged negligence from the employee's intentional conduct, the Sky and Old Republic courts impermissibly ignored the employer's independent acts which gave rise to the alleged tort. . . . This court finds the allegation of negligent hiring in the underlying complaint is an `occurrence' [from the standpoint of the employer] despite [the employee's] intentional conduct."); Town of Kimball v. Aetna Cas. & Sur. Co., 667 F.2d 439, 440 (4th Cir.1981) (same).
 
 
 41
 Nevertheless, uncertainty exists as to whether the claims against Derma and Brown arise out of the rendering of professional services. In particular, the district court refused to "torture the meaning of `professional services' to include sexually assaulting a client in the guise of massaging her." Because the district court held that "the natural meaning of the term `professional services' includes massaging clients only," it found that Burden was not engaged in the provision of a professional service when he assaulted Allen, Doe, and Roe. Cerrato v. American Home Insurance Co. may support this reasoning. No. 3:99CV2355 (RNC), 2001 WL 1911768, at *1-2 (D.Conn. Apr. 2, 2001). In Cerrato, a district court, construing Connecticut law, held that an attorney's professional liability insurance policy did not cover a negligence claim for sexual assault that occurred while the attorney was preparing his client to testify in court. Id.[4] The Cerrato court stated that the "natural meaning of `professional services' includes preparing clients for testifying in court. However, it does not include assaulting a client in the guise of preparing her to testify." Id. at *2.
 
 CONCLUSION
 
 42
 We hereby order the Clerk of this Court to transmit to the Clerk of the Supreme Court of Connecticut a Certificate, as set forth below, together with a complete set of the briefs, appendices, and records filed in this Court by the parties. The parties are directed to bear equally such fees and costs as may be directed by the Supreme Court of Connecticut. Conn. Gen.Stat. § 51-199b(l) (2005).
 
 
 43
 The panel retains jurisdiction to address any additional issues that may need to be reached after the Supreme Court of Connecticut has offered its guidance or declined certification.
 
 CERTIFICATE
 
 44
 As ordered by the United States Court of Appeals for the Second Circuit, the following questions are hereby certified to the Supreme Court of Connecticut, pursuant to Conn. Gen Stat. § 51-199b and 2d Cir. R. § 0.27.
 
 
 45
 Assuming familiarity with the record in this matter.
 
 
 46
 (1) In a policy with multiple coverage parts like the NIC policy, does a criminal acts exclusion in the Commercial Crime Coverage Form apply to disputes arising under the Commercial General Liability Form?
 
 
 47
 (2) Can Burden's plea of nolo contendere and the resulting conviction be used to trigger an insurance policy's criminal acts exclusion?
 
 
 48
 (3) When applied to the business of massage therapy, does the term "professional services" include acts ancillary to the business of massage therapist, e.g., the investigating, training, monitoring, supervising of masseurs?
 
 
 49
 (4) Under the language of the NIC Policy, do the negligence claims against Derma and Brown arise out of the rendering of professional services when the underlying acts involve physical and sexual assaults during the performance of a massage?
 
 
 50
 Of course, the Supreme Court of Connecticut may reformulate these questions, Conn. Gen.Stat. § 51-199b(f)(3), and address any additional questions of Connecticut law that it deems relevant to the disposition of this matter.
 
 
 
 Notes:
 
 
 [1]
 The parties refer to this policy as the CGL policy in their briefs, but since it is actually a single policy offering five different types of coverage, only one of which is commercial general liability, we refer to it in its entirety as the NIC policy
 
 
 [2]
 In granting NIC's motion for summary judgment, the district court held that a criminal acts exclusion in the Building and Personal Property Coverage Form precluded coverage for Derma and Brown. NIC does not rely on this argument
 
 
 [3]
 Further clouding the issue is the Second Circuit's decision inBurrell v. U.S., which discusses this Court's understanding of Connecticut's treatment of nolo contendere pleas. 384 F.3d 22, 29-31 (2d Cir.2004). "To the extent Connecticut law does draw a distinction between Alford and nolo contendere pleas on the one hand, and standard guilty pleas on the other, it is not in the fact of conviction, but in the evidentiary use that can be made of these different pleas as admissions of factual guilt in subsequent proceedings. . . ." Id. at 29. "But in establishing an `admissions limitation' on the use of Alford and nolo contendere pleas, Connecticut courts have never suggested that the judgments resulting from such pleas are not `convictions' under state law. . . ." Id. at 30. "[W]here the relevant issue is simply the fact of a prior conviction, and not whether defendant admitted the charged criminal conduct, Connecticut law appears not to limit the use of convictions based on Alford and nolo contendere pleas." Id. "Accordingly, while we recognize that Connecticut courts place some limitations on the use of Alford and nolo contendere pleas as admissions of charged criminal conduct, we reject [the] argument that this somehow renders the judgments entered after sentence on such pleas something less than `convictions' under Connecticut law. . . ." Id. at 31.
 
 
 [4]
 In reaching its decision, theCerrato court distinguished, on its facts, St. Paul Fire & Marine Ins. Co. v. Shernow, 222 Conn. 823, 610 A.2d 1281 (1992), which reached a conclusion opposite that of the Cerrato court. Cerrato, 2001 WL 1911768, at *2. In Shernow, a dentist administered excessive amounts of nitrous oxide to a patient in violation of the standard of care and then sexually assaulted her. Shernow, 610 A.2d at 1283 n. 3. The patient sought damages for both malpractice in the administration of excessive anesthesia and the sexual assault. Id. at 1282-83. The court held the sexual assault claim was covered under a professional services policy because the breach of the standard of care with respect to the nitrous oxide was "inextricably intertwined and inseparable from the intentional conduct that serve[d] as the basis for the separate claim of sexual assault. . . ." Id. at 1285. In Cerrato, however, there was no separate claim against the defendant that was independently covered by the policy (like the nitrous oxide claim in Shernow). Cerrato, 2001 WL 1911768, at *2. Rather, Cerrato's client "sought to recover emotional distress damages caused by the sexual assault itself without linking the assault claim to a claim covered by the policy." Id.