698 A.2d 9

PRINCETON INSURANCE COMPANY, PLAINTIFF–APPELLANT,
v. PRASERT CHUNMUANG, M.D., DEFENDANT, AND JUNE
DAVIS, DEFENDANT–RESPONDENT.

Argued April 28, 1997—Decided August 8, 1997.

*Joseph P. La Sala* argued the cause for appellant (*McElroy, Deutsch & Mulvaney,* attorneys; *Mr. La Sala, Thomas P. Scrivo,* and *John T. Coyne,* on the briefs).

*Donald A. Caminiti* argued the cause for respondent (*Breslin and Breslin,* attorneys; *Karen Boe Gatlin* and *Lawrence Z. Farber,* on the brief).

*Michael A. Ferrara, Jr.,* and *Jennifer A. Deiter* submitted a brief on behalf of *amicus curiae* Association of Trial Lawyers of America–New Jersey (*Ferrara & Rossetti,* attorneys).

*Joseph R. McDonough* submitted a brief on behalf of *amicus curiae* American Insurance Association (*Graham, Curtin & Sheridan,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

The critical issue posed by this appeal is whether an exclusion from coverage in a medical malpractice insurance policy for "injury resulting from [the physician's] performance of a criminal act" insulates the insurer from liability for compensatory damages awarded to the insured's patient in an action based on a sexual assault by the insured physician in the course of a gynecological examination. In a published opinion, 292 *N.J.Super.* 349, 678 *A.*2d 1143 (1996), a divided panel of the Appellate Division affirmed the Law Division's determination that the insurer was liable for the

compensatory damages award notwithstanding the criminal-acts exclusion in its medical-malpractice policy. The insurer, Princeton Insurance Company (Princeton), appeals to this Court as of right. *R.* 2:2–1(a)(2).

I

This declaratory judgment action filed by Princeton to determine its liability under the medical-malpractice policy at issue was preceded by a civil action instituted in 1994 by June Davis against Dr. Prasert Chunmuang, Princeton's insured. In that action Davis sought compensatory and punitive damages against Chunmuang for medical malpractice, negligent and intentional infliction of emotional distress, sexual assault, and assault and battery. Chunmuang failed to answer the complaint, and Princeton, on whom the complaint was also served by order of the Law Division, declined to answer or provide a defense for Chunmuang. The Law Division entered a default judgment against Chunmuang.

At the proof hearing, attended by an attorney for Princeton who did not participate, Davis testified that she had made an appointment to see Chunmuang in the fall of 1992 because she was experiencing monthly cramping but had not yet menstruated. Davis was seventeen years old at the time. Davis stated that the first thing that had made her feel uncomfortable was that when Chunmuang arrived in the examination room, he told her to undress, but he did not immediately leave the room. She waited until he left to undress and then closed the door after him when he left it ajar.

In the course of the examination, during which Davis was in the stirrups, Chunmuang twisted his hand inside of her in a way that she perceived to be wrong. She tried to move away and he repeatedly moved her back down on the table and told her "Don't worry about it." This went on for five or ten minutes. During that time he asked her whether she was sexually active, and then why not. Afterwards, he examined her breasts. Again, Davis perceived that his actions were not appropriate to a breast exam,

which she had read about in pamphlets. She became very upset. When Davis was ready to leave the office, Chunmuang prescribed some pills and told her to come back in ten days.

Davis did not go back because Chunmuang had made her "feel dirty." At the time of the proof hearing, although she continued to experience cramping and had not yet menstruated, Davis had not been able to seek medical assistance from another gynecologist because of the emotional distress that resulted from her examination by Chunmuang. She did not present any expert medical testimony at the proof hearing.

Davis did present, however, an administrative complaint against Chunmuang by the Attorney General's office on behalf of the Board of Medical Examiners dated March 4, 1993; an order of temporary suspension dated March 16, 1993; and an order revoking Chunmuang's license dated June 17, 1993. The complaint outlined charges of misconduct under similar circumstances brought independently by five women, including Davis. Davis was the only minor. The other four women were longterm patients of Chunmuang's.

Davis's attorney also informed the court, and the court took judicial notice, that Davis and several other women had made criminal complaints against Chunmuang, who was subsequently indicted. Chunmuang pled guilty to several charges, although apparently the charge concerning Davis was dismissed as part of the plea bargain.

The court found that Davis's "testimony reflects activity and actions on the part of the doctor, which were not only a deviation from accepted standards but clearly a criminal act in the sense of amounting to a sexual assault." The court indicated that it found confirmation of the sexual assault in the Attorney General's complaint and the indictments of Chunmuang. Overall, the court was satisfied "that the doctor has departed from accepted standards and that the plaintiff has established a case of medical malpractice." The court noted that the plaintiff was caught in a "catch–22" situation regarding the proof of compensatory damages be-

cause part of her injury was her continuing inability to visit a gynecologist for further diagnosis and treatment. Confessing that it was "at a loss a little bit as to what the compensatory damages should be," the court nevertheless awarded Davis $50,000 in compensatory damages as well as $50,000 in punitive damages. The court made no finding that any portion of the compensatory damages was attributable to acts of medical malpractice distinct and separate from the sexual assault, nor did Davis offer any evidence that would support such a finding.

Prior to the final disposition of Davis's suit against Chunmuang, Princeton instituted this declaratory judgment action against Chunmuang and Davis seeking a determination that it had no duty either to defend Chunmuang in Davis's civil action or to satisfy any portion of the judgment against Chunmuang. In support of its motion for summary judgment, Princeton submitted the complaint in Davis's action against Chunmuang, the transcript of the proof hearing, the final judgment in favor of Davis, and a copy of the medical-malpractice policy issued to Chunmuang.

The policy declaration page states that it provides professional liability coverage. Under "Coverage," the policy states in relevant part:

We will pay all amounts up to the limit of liability which you become legally obligated to pay as a result of injury to which this insurance applies. The injury must be caused by a "medical incident" arising out of your supplying or failure to supply professional services.

"Medical Incident" is further defined, in relevant part, as: "any act or failure to act ... in the furnishing of the professional medical ... services by you...."

Under "Exclusions," the policy states in relevant part:

This insurance does not apply for:

(a) injury resulting from your performance of a criminal act.

The Law Division determined that the punitive damages portion of the judgment recovered by Davis was based solely on Chunmuang's criminal conduct, granting summary judgment to Princeton concerning its obligation to satisfy that portion of Davis's judgment. Concluding that the compensatory damages portion of

the judgment was based on both medical malpractice and criminal conduct, the Law Division granted summary judgment to Davis concerning Princeton's obligation to satisfy the compensatory damages portion of her judgment against Chunmuang.

In affirming the Law Division, the Appellate Division majority "construe[d] the Princeton policy to mean that there will be coverage for 'injury' resulting from 'professional services' unless the 'injury' results from a 'criminal act.' " 292 *N.J.Super.* at 354, 678 *A*.2d 1143. The majority agreed with Davis that in this case, the "services performed and the assault are intertwined and inseparable." *Ibid.* Indicating that its view may represent a minority position, the majority nevertheless cited with approval *St. Paul Fire & Marine Insurance Co. v. Asbury,* 149 *Ariz.* 565, 720 *P*.2d 540, 542 (App.1986), which held that claims based on a physician's intentionally-improper manipulations during a gynecological examination were covered by his professional liability policy, because the abuse was "intertwined with and inseparable from the services provided." 292 *N.J.Super.* at 355, 678 *A*.2d 1143. The majority acknowledged, however, that the policy at issue in *Asbury* did not contain an exclusion for criminal acts. *Id.* at 356, 678 *A*.2d 1143. The majority also cited with approval language in *Asbury* stating that public policy favored protecting the interests of innocent victims. *Id.* at 355, 678 *A*.2d 1143.

Dissenting, Judge Keefe stressed that Davis did not dispute that Chunmuang's actions were criminal, and reasoned that "but for Dr. Chunmuang's criminal act, Davis would have suffered no compensable injury." *Id.* at 362, 678 *A*.2d 1143. Judge Keefe distinguished this case from *Asbury* because the medical-malpractice policy in *Asbury* contained no exclusion for criminal acts. Judge Keefe stated that the "intertwined and inseparable" nature of the services and the assault would be relevant only to the decision whether the injuries were covered as the result of a "medical incident," asserting that the nature of the services is irrelevant in this case because of the express exclusion for criminal acts. *Id.* at 362–63, 678 *A*.2d 1143.

## II

Before the Appellate Division, Princeton contends that it was not liable for the damages awarded against Chunmuang under the basic terms of its policy because the sexual assault was not a "medical incident." Princeton now asserts that it is not responsible for the damages because they are excluded from coverage by the policy's criminal-acts exclusion. We address the law relevant to the question of basic coverage and the law relevant to the question of the exclusion separately.

### A

Individual physicians are not required to carry medical malpractice insurance in New Jersey.[1] *See generally N.J.S.A.* 17:30D–1 to –17 (stating provisions related to medical malpractice liability insurance); *N.J.S.A.* 45:1–1 to –27 (stating general provisions related to professions and occupations regulated by state boards of registration and examination); *N.J.S.A.* 45:9–1 to –58 (stating provisions related to medicine and surgery). Because medical malpractice insurance is not statutorily required, determining the scope of coverage under a malpractice policy is primarily a matter of contract interpretation. *Cf. Allstate Ins. Co. v. Malec*, 104 *N.J.* 1, 6, 514 *A.*2d 832 (1986) (stating that where insurance is statutorily required, "the policy is automatically amended by operation of law to conform to the statutory standard."). In general, insurance policies are interpreted according to the objectively reasonable expectations of the parties. *Voorhees v. Preferred Mut. Ins. Co.*, 128 *N.J.* 165, 175, 607 *A.*2d 1255 (1992). Because insurance policies are typically contracts of adhe-

---

[1] The original version of Assembly Bill No. 1552, which was eventually enacted as *L.* 1975, *c.* 301, and codified at *N.J.S.A.* 17:30D–1 to –17, made malpractice liability insurance compulsory for all medical practitioners. *See* Assembly Commerce, Industry and Professions Committee, *Statement to Assembly Bill No. 1552*, at 1 (Feb. 10, 1975). Those provisions of the bill did not survive. However, the Legislature has expressed a policy in favor of medical malpractice insurance by establishing a reinsurance fund and enacting other provisions intended to ensure the availability of such insurance. *See N.J.S.A.* 17:30D–2.

sion, ambiguities generally will be resolved in favor of the insured. *Sparks v. St. Paul Ins. Co.*, 100 *N.J.* 325, 334–39, 495 *A.*2d 406 (1985).

The majority rule in other jurisdictions is that claims based on sexual assaults on patients by health-care providers other than mental-health professionals fall outside the scope of coverage provided by policy language substantially similar to the policy at issue. *See Snyder v. Major*, 789 *F.Supp.* 646, 649 (S.D.N.Y.1992) (summarizing case law), *modified*, 818 *F.Supp.* 68 (S.D.N.Y.1993); David S. Florig, *Insurance Coverage for Sexual Abuse or Molestation*, 30 *Tort & Ins. L.J.* 699, 721, 724 (1994) (same); Debra E. Wax, Annotation, *Coverage and Exclusions of Liability or Indemnity Policy on Physicians, Surgeons, and Other Healers*, 33 *A.L.R.4th* 14 § 7 (1984 & 1996 Supp.) (same).

The case most frequently cited for that rule is *Hirst v. St. Paul Fire & Marine Ins. Co.*, 106 *Idaho* 792, 683 *P.*2d 440 (App.1984). *See, e.g., Lindheimer v. St. Paul Fire & Marine Ins. Co.*, 643 *So.*2d 636, 639 (Fla.Dist.Ct.App.1994), *rev. denied*, 651 *So.*2d 1194 (1995); *Standlee v. St. Paul Fire & Marine Ins. Co.*, 107 *Idaho* 899, 693 *P.*2d 1101, 1102 (App.1984); *St. Paul Fire & Marine Ins. Co. v. Quintana*, 165 *Mich.App.* 719, 419 *N.W.*2d 60, 62 (1988); *South Carolina Med. Malpractice Liab. Ins. JUA v. Ferry*, 291 S.C. 460, 354 *S.E.*2d 378, 381 (1987); *Washington Ins. Guar. Ass'n v. Hicks*, 49 *Wash.App.* 623, 744 *P.*2d 625, 627 (1987). In *Hirst, supra*, a physician drugged and sexually assaulted a boy who had been brought to him for treatment of a wrestling injury to his hand. 683 *P.*2d at 442. The court held that the tortious actions of the physician were not covered under his malpractice insurance, emphasizing the lack of causal relationship between the treatment sought and the injury:

[E]ven if we assume that "professional services" embrace all enumerated activities within the "practice of medicine," including "treat[ment] [of] any human disease [or] injury," there still must be a causal relationship between such treatment and the harm alleged by the malpractice claimant. Here, as the district court noted, there was no specific showing in the record that Mark was damaged in any way simply from the administration of the drugs. Nor was there any showing that Donehue negligently treated the boy's injuries or illness. The district court found that, in spite of the Hirsts' general allegations, the action in reality was one in tort

for sexual molestation and that the use of the drugs merely rendered Mark more susceptible to Donehue's "advances." We agree.

[*Id.* at 444.]

Thus, *Hirst* embraced a narrow test for malpractice coverage based on a restrictive definition of the policy term "professional services."

*Hirst* and many of the cases that have followed it looked to the discussion in *Marx v. Hartford Accident & Indemnity Co.*, 183 *Neb.* 12, 157 *N.W.*2d 870 (1968), to support that definition of "professional services." *See Hirst, supra,* 683 *P.*2d at 444 (citing *Marx* ); *Roe v. Federal Ins. Co.*, 412 *Mass.* 43, 587 *N.E.*2d 214, 217 (1992) (citing *Marx* and listing other jurisdictions that follow *Marx* ); Florig, *supra,* 30 *Tort & Ins. L.J.* at 721 (discussing reliance on *Marx* ). *Marx, supra,* defined the scope of malpractice coverage as follows:

[A medical malpractice] insurer's liability is ... limited to the performing or rendering of "professional" acts or services. Something more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind. The term "professional" in the context used in the policy provision means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.... In determining whether a particular act is of a professional nature or a "professional service" we must look not to the title or character of the party performing the act, but to the act itself.

[157 *N.W.*2d at 871–72 (citations omitted).]

Among jurisdictions that hold that sexual assault by a physician on a patient is generally not covered by malpractice insurance, a minority of courts have adopted an exception to that rule for sexual assaults that are "intertwined with and inseparable from the services provided." *Asbury, supra,* 720 *P.*2d at 542; *see St. Paul Fire & Marine Ins. Co. v. Shernow,* 222 *Conn.* 823, 610 *A.*2d 1281, 1285 (1992); *St. Paul Fire & Marine Ins. Co. v. Torpoco,* 879 *S.W.*2d 831, 834 (Tenn.1994). The primary case espousing that approach is *Asbury, supra,* which, like the case on appeal, involved a gynecologist who was accused of improperly manipulat-

ing his patients during gynecological examinations. See 720 *P*.2d at 541. The *Asbury* court accepted the analysis of *Marx* and *Hirst*, and the general rule that sexual assaults by physicians on patients fall outside of malpractice coverage. *See id.*, at 541–42. However, the court emphasized that in cases such as *Hirst*, involving a sexual assault during treatment for a hand injury, the assault was not related in any way to the treatment sought. *See id.*, at 542. In contrast, the *Asbury* court found that injuries sustained in a sexual assault that took place during a gynecological examination were covered as injuries caused by the "providing or withholding of professional services." *Id.* at 541. The policy in question in *Asbury* did not contain any applicable exclusions. *Ibid.*

Although the Supreme Court of Connecticut ostensibly adopted *Asbury*'s "intertwined ... and inseparable rule" in *Shernow, supra*, 610 *A*.2d at 1285, that case was factually very different, involving a dentist who drugged his patient and sexually assaulted her, see *id.* at 1282–83. Like the *Asbury* court, the *Shernow* court distinguished *Hirst, supra*, because the assault in that case was not closely related to the treatment sought. *Id.*, 610 *A*.2d at 1284. However, the *Shernow* court also emphasized that "unlike *Hirst*, the jury here heard evidence of specific acts of professional negligence, some of which had occurred prior to the sexual encounter," and that the claimant's injuries were due not only to the sexual assault itself but also to the administration of excessive amounts of anesthesia. *Id.*, 610 *A*.2d at 1284–85. Therefore, the result in *Shernow* can be understood to rest on somewhat different grounds from those supporting the result in *Asbury*.

As support for the exception to the general rule denying coverage for tortious acts that are "intertwined ... and inseparable" from the professional services provided, the *Asbury* court relied on cases holding that malpractice insurance covers claims based on sexual contact between psychiatrists and patients. See *Asbury, supra*, 720 *P*.2d at 542 (citing *St. Paul Fire & Marine Ins. Co. v. Mitchell*, 164 *Ga.App.* 215, 296 *S.E.*2d 126, 127–29 (1982);

*Vigilant Ins. Co. v. Kambly,* 114 *Mich.App.* 683, 319 *N.W.*2d 382, 384–85 (1982); *Zipkin v. Freeman,* 436 *S.W.*2d 753, 761 (Mo. 1969)). Contrary to the general rule for sexual assault by a physician on a patient, the general rule for claims based on sexual contact between a mental health care professional and a patient is that such contact constitutes malpractice for which the malpractice insurer is liable. *See Snyder, supra,* 789 *F.Supp.* at 649 (reviewing cases); Florig, *supra,* 30 *Tort & Ins. L.J.* at 727 (same); Wax, *supra,* 33 *A.L.R.4th* 14 § 7 (same). However, most often, the factual basis in cases involving mental-health-care professionals differs significantly from cases involving other physicians because the sexual conduct is consented to as such, although that consent may be considered coerced. The rule providing coverage for such cases is based on the theory that the phenomenon of transference is an integral part of psychotherapy and its mishandling by the mental health professional constitutes malpractice. *See Simmons v. United States,* 805 *F.*2d 1363, 1364–66 (9th Cir.1986); *Snyder, supra,* 789 *F.Supp.* at 649; Florig, *supra,* 30 *Tort & Ins. L.J.* at 727; Wax, *supra,* 33 *A.L.R.4th* 14 § 7.

Most courts that have considered *Asbury* in the context of sexual assaults by physicians have declined to follow it. *See, e.g., D.D. v. Insurance Co. of North Am.,* 905 *P.*2d 1365, 1369 n. 8 (Alaska 1995); *St. Paul Fire & Marine Ins. Co. v. Alderman,* 216 *Ga.App.* 777, 455 *S.E.*2d 852, 854 (1995); *Roe v. Federal Ins. Co., supra,* 587 *N.E.*2d at 218–19; *Niedzielski v. St. Paul Fire & Marine Ins. Co.,* 134 *N.H.* 141, 589 *A.*2d 130, 132–33 (1991); *New Mexico Physicians Mut. Liab. Co. v. LaMure,* 116 *N.M.* 92, 860 *P.*2d 734, 739 (1993); *Standard Fire Ins. Co. v. Blakeslee,* 54 *Wash.App.* 1, 771 *P.*2d 1172, 1176–77, *review denied,* 113 *Wash.*2d 1017, 781 *P.*2d 1320 (1989). In *St. Paul Insurance Co. v. Cromeans,* 771 *F.Supp.* 349 (N.D.Ala.1991), which held that sexual abuse of two minor girls was not covered as "professional services," the court criticized *Asbury* for its reliance on the mental health professional cases and for its assertion that a sexual assault could be intertwined with professional services:

[T]he *Asbury* case relies *exclusively* on the cases in which a psychiatrist or psychologist failed to properly handle the "transference phenomenon," a medically recognized condition.

... [T]he *Asbury* case is a poorly reasoned decision in that it held that massaging a woman's clitoris was intertwined with and inseparable from a gynecological examination. The *Asbury* court apparently attempts to distinguish *Hirst* (and its progeny) by the *location* of the various parts of the anatomy....

Moreover to this point, the *Asbury* court seems to be saying that if the physician is treating a *sexual* part of the patient's body (or a part near thereto) and commits sexual abuse by improperly manipulating or stroking the patient in the same general area, it is thus "intertwined" with treatment and ipso facto there is insurance coverage. [The insurance company] argues and this Court agrees that this "Asbury" reasoning is illogical.

*[Id.,* at 353]

Another federal court that considered the "intertwined ... and inseparable" exception originated by *Asbury* declined to follow it because (1) the exception did not comport with the parties' expectations; (2) its boundaries were undefined; and (3) the distinction between assaults during examinations of erogenous zones and assaults during other physical examinations had no logical basis. The court observed:

Plaintiff suggests that this Court use *Asbury* to frame a rule that sexual misconduct is a medical incident if (a) it arises out of psychiatric treatment or (b) it arises out of treatment of the erogenous zones....

We reject the proposed rule for several reasons. First, we emphasize that the fundamental issue here is not whether the conduct in question is negligence, but whether a particular contract was intended to cover this conduct.

. . . .

Second, we are hesitant to adopt a rule with such amorphous boundaries. We think it unworkable for courts to be placed in the position of deciding what constitutes a "sexual incident arising out of treatment of erogenous zones." Because of the subjectivity of the term "erogenous zone," courts are poorly situated to second guess litigants' accounts of what is or is not an erogenous zone in a particular case. The proposed rule would invite such disputes.

Third, even considered on its own right, we are not convinced of the merit of the proposed rule. We are skeptical of the suggestion, implicit in plaintiff's proposal, that a physician's duty to refrain from sexually abusing his (or her) patients is any greater in cases where the physician is treating the erogenous zones. Perhaps the patient's fear of such abuse is greater in such cases—and undoubtedly it is appalling when such fears are realized, as in this case. However, we think it no less appalling and no less a violation[ ] of a physician's duty when, as in *Hirst,* for example, a person being treated for a wrist injury was drugged and sexually

abused. We thus see no reason to carve out the class of exceptions proposed by plaintiff.

[*Snyder, supra,* 789 *F.Supp.* at 650 (footnotes omitted).]

Although the courts of this state previously have not considered medical malpractice insurance in the context of a sexual assault by a physician on a patient, the Appellate Division recently has addressed the scope of a medical malpractice policy as applied to an assault by a physician on a nurse. *See Records v. Aetna Life & Cas. Ins.,* 294 *N.J.Super.* 463, 683 *A.*2d 834 (App.Div.1996). The policy provided coverage for "injury arising out of the rendering of or failure to render ... professional services" and defined "professional services" to mean "services requiring specialized knowledge and mental skill in the practice of the profession." *Id.* at 467, 683 *A.*2d 834. The nurse alleged that the physician assaulted her after becoming angry because she transferred his patient from a nursing home to a hospital. *Id.* at 465, 683 *A.*2d 834. The Appellate Division held that the nurse's claim was covered by the malpractice policy. *Id.* at 465–67, 683 *A.*2d 834. Rather than focus on the definition of "professional services," the Appellate Division focused on the term "arising out of":

[T]he MIIX policy provides coverage not only for claims of malpractice in the direct "rendering of professional services" but also for any other claim "arising out of" the rendering of professional services. The phrase "arising out of" has been defined broadly in other insurance coverage decisions to mean conduct "originating from," "growing out of" or having a "substantial nexus" with the activity for which coverage is provided. *Westchester Fire Ins. Co. v. Continental Ins. Cos.,* 126 *N.J.Super.* 29, 312 *A.*2d 664 (App.Div.1973), *aff'd o.b.,* 65 *N.J.* 152, 319 *A.*2d 732 (1974); *Franklin Mut. Ins. Co. v. Security Indem. Ins. Co.,* 275 *N.J.Super.* 335, 340–41, 646 *A.*2d 443 (App.Div.), *certif. denied,* 139 *N.J.* 185, 652 *A.*2d 173 (1994); *see also Harrah's Atlantic City, Inc. v. Harleysville Ins. Co.,* 288 *N.J.Super.* 152, 157–59, 671 *A.*2d 1122 (App.Div.1996); *Minkov v. Reliance Ins. Co.,* 54 *N.J.Super.* 509, 516, 149 *A.*2d 260 (App.Div.1959). Consequently, if plaintiff had consulted with Koch in deciding whether to transfer a patient to the hospital and negligently stepped on her toe during the course of that consultation, any resulting injury could reasonably be said to "originate from," "grow out of" or have a "substantial nexus" with plaintiff's rendering of professional services and thus fall within the coverage of the MIIX policy.

[*Id.* at 468, 683 *A.*2d 834.]

The *Records* approach can be termed a "substantial nexus" test, and emphasizes "the existence of a substantial nexus between the

subject matter of the plaintiff's discussion with [the injured party] and his professional practice rather than [the policy holder's] conduct during that discussion." *Id.* at 469, 683 *A.*2d 834. The court specifically stated that "conduct which has a substantial nexus to an insured activity may be found to 'arise out of' that activity even if it is unlawful." *Id.* at 469, 683 *A.*2d 834. The "substantial nexus" test is significantly broader than the *Marx* test for malpractice coverage that is followed by both *Hirst* and *Asbury.*

Cases in other jurisdictions that apply a restrictive test to hold that malpractice insurance generally does not cover injuries caused by sexual assaults by physicians on patients may rest in part on the public policy ground that persons should not be able to insure themselves for the results of such acts. *See, e.g., Cromeans, supra,* 771 *F.Supp.* at 352 ("All contracts insuring against intentional misconduct are void in the State of Alabama as against public policy."); *Lindheimer, supra,* 643 *So.*2d at 639 ("Any insured professional should not, in any way, be insulated from the consequences of his reprehensible sexual abuse."); *see also Medical Mut. Liab. Ins. Soc. v. Azzato,* 94 *Md.App.* 632, 618 *A.*2d 274, 280 (implying that if criminal acts exclusion did not apply, physician would be indemnified for "criminal malpractice"), *cert. denied,* 330 *Md.* 319, 624 *A.*2d 491 (1993).

This Court has acknowledged the policy considerations that justify restricting an insurer's obligation to indemnify an insured against the civil consequences of his or her own wilful criminal act, see *Ruvolo v. American Cas. Co.,* 39 *N.J.* 490, 496, 189 *A.*2d 204 (1963), as well as the competing public interest in compensating innocent victims, see *Burd v. Sussex Mut. Ins. Co.,* 56 *N.J.* 383, 398–99, 267 *A.*2d 7 (1970). Thus, in *Ambassador Insurance Co. v. Montes,* this Court held that where the beneficiary of liability insurance is an innocent third party, rather than the insured, payment should be made "so long as the benefit thereof does not enure to the assured." 76 *N.J.* 477, 484, 388 *A.*2d 603 (1978). Accordingly, we held that the insurer should be indemnified by the

insured for payments made to cover the insured's civil liability for a criminal event. *Ibid.* Consequently, the recognition of insurance coverage for injuries caused by an insured's criminal acts should not be understood as condoning unlawful conduct.

### B

In general, insurance policy exclusions must be narrowly construed; the burden is on the insurer to bring the case within the exclusion. *See Burd, supra,* 56 *N.J.* at 399, 267 *A.*2d 7. However, exclusions are presumptively valid and will be given effect if "specific, plain, clear, prominent, and not contrary to public policy." *Doto v. Russo,* 140 *N.J.* 544, 559, 659 *A.*2d 1371 (1995).

Exclusions for acts that are intentional, as opposed to criminal, have sometimes been narrowly construed, based in part on the subjective nature of intent. In *Burd, supra,* 56 *N.J.* at 396–99, 267 *A.*2d 7, this Court held that a criminal conviction was evidentiary but not conclusive proof of intent as contemplated by the exclusion. *See also Ruvolo, supra,* 39 *N.J.* at 498, 189 *A.*2d 204 (holding that concept of insanity in context of intentional-act exclusion was broader than concept accepted as defense to criminal charge); *Atlantic Employers Ins. Co. v. Chartwell Manor School,* 280 *N.J.Super.* 457, 466, 655 *A.*2d 954 (App.Div.1995) (holding that guilty plea to endangering welfare of child did not estop insured from establishing lack of intent required by policy); *Prudential Property & Cas. Ins. Co. v. Kollar,* 243 *N.J.Super.* 150, 156, 578 *A.*2d 1238 (App.Div.1990) (holding insured not estopped from relitigating intent for purposes of coverage despite guilty plea to arson).

Exclusions for claims based on criminal acts, on the other hand, require application of an objective standard. In *Allstate Insurance Co. v. Schmitt,* 238 *N.J.Super.* 619, 570 *A.*2d 488 (App.Div.), *certif. denied,* 122 *N.J.* 395, 585 *A.*2d 394 (1990), the Appellate Division rejected the insured's argument that only the intended results of criminal conduct were excluded by such a provision.

*See id.* at 623, 570 *A.*2d 488. In general, proof of a criminal conviction is sufficient to bring the conduct within the exclusion. *See id.* at 632–33, 570 *A.*2d 488.

In *Malec, supra,* this Court considered whether, in light of the *Ambassador* holding that insurance companies would be indemnified by the insured for claims based on civil liability for the insured's criminal acts, explicit exclusions for claims based on such liability should be enforced. *See* 104 *N.J.* at 11–13, 514 *A.*2d 832. *Malec* involved an exclusion in an automobile liability policy for damages intentionally caused by the insured; the insurance company denied coverage for claims arising from a collision that the company contended was intentional. *See id.* at 5, 514 *A.*2d 832. The *Malec* Court held that "a specific exclusion . . . from coverage for the insured's liability caused by his intentional wrongful acts does not violate . . . public policy. . . ." *Id.* at 13, 514 *A.*2d 832; *see also New Jersey Mfrs. Ins. Co. v. Brower,* 161 *N.J. Super.* 293, 300, 391 *A.*2d 923 (App.Div.1978) (holding that *Ambassador* did not control where policy expressly excluded injury caused by intentional act). The *Malec* Court reasoned that "[p]olicy provisions that exclude coverage for liability resulting from intentional wrongful acts are 'common,' are 'accepted as valid limitations,' and are consistent with public policy." 104 *N.J.* at 6, 514 *A.*2d 832 (citing *Ruvolo, supra,* 39 *N.J.* at 496, 189 *A.*2d 204).

Courts in other jurisdictions have generally upheld criminal-act, intentional-act or sexual-misconduct exclusions in medical malpractice policies. See, *e.g., Illinois State Med. Ins. Servs., Inc. v. Cichon,* 258 *Ill.App.*3d 803, 196 *Ill.Dec.* 277, 284, 629 *N.E.*2d 822, 829 (1994); *LaMure, supra,* 860 *P.*2d at 739–40; *Azzato, supra,* 618 *A.*2d at 278. For example, the court in *Rivera v. Nevada Medical Liability Insurance Co.,* 107 *Nev.* 450, 814 *P.*2d 71, 72 (1991), held that a claim based on a rape that occurred during the course of a gynecological examination was excluded from coverage by a policy exclusion for sexual misconduct. The court rejected the claimant's argument that the exclusion precluded coverage only for injuries that stemmed from tortious conduct that was

separate from the rendering of professional services. *Id.*, 814 P.2d at 73. The *Rivera* court also rejected the claimant's argument that the exclusions for sexual and for criminal acts in the policy should be void as against public policy when applied to deny recovery to an innocent third party. *Id.* at 74. Noting that "[t]he average law-abiding professional would not desire to pay more so that the policy would cover their own criminal or intentionally tortious conduct," the court emphasized that "an insurance policy is nothing more than a contract between the insured and the carrier.... [and] insurance companies may specifically exclude anything from their policy that state law does not forbid them from excluding." *Ibid.*

## III

The policy at issue in this appeal covers an injury if it is "caused by a 'medical incident' arising out of [the physician's] supplying or failure to supply professional services." "Medical Incident" is defined in relevant part as "any act or failure to act ... in the furnishing of the professional medical ... services by [the physician]." That language does not restrict the scope of coverage to injuries resulting only from acts that can fairly be characterized as "professional" in nature, as would be implied by the *Marx/Hirst* test. A fair reading of the Princeton policy language suggests that the coverage encompasses injuries caused by *any* act or failure to act by the physician that occurs in the course of furnishing professional services. Therefore, we do not find it necessary to rely on the reasoning in *Asbury* that a sexual assault during a gynecological examination is more intertwined with the professional services sought than a sexual assault in the course of another type of physical examination. We agree with the *Records* court that the important question is simply whether a substantial nexus exists between the context in which the acts complained of occurred and the professional services sought.

The acts complained of by Davis took place in Chunmuang's office in the course of what he represented to be a

medical examination. Those acts were possible only because Davis entrusted herself to the physician's care for the purpose of receiving . diagnosis and treatment for a medical problem. We have no difficulty in concluding that those acts constituted a "medical incident" as defined by Chunmuang's malpractice policy.

That finding is not dispositive, however, because the policy contained an exclusion for claims based on injuries resulting from "the performance of a criminal act" by the insured. We reiterate that such exclusions are valid and do not violate public policy. *See Malec, supra*, 104 *N.J.* at 6–12, 514 *A.2d* 832. Although we again acknowledge the public interest in compensating innocent victims, we also recognize that a malpractice insurance policy is essentially a contract between the insurer and the insured. Civil liability for a criminal act is dramatically different from the liability typically contemplated when a physician purchases malpractice insurance. We do not believe that an exclusion for liability based on criminal acts runs counter to the basic purpose of malpractice insurance or to the parties' probable intentions and expectations.

*Asbury*, which concerned a malpractice policy without a criminal-acts exclusion, is not instructive on the application of the exclusion in the Princeton policy. We agree with the dissenting opinion in the Appellate Division that the analysis in *Asbury* would be "relevant only in the context of deciding whether Dr. Chunmuang's conduct constituted 'professional services' · within the meaning of the policy." 292 *N.J.Super.* at 362, 678 *A.2d* 1143. The *Asbury* court assumed that the physician's acts were criminal. The question for that court was whether the acts also constituted a "professional service" for the purpose of malpractice-insurance coverage. As noted, we do not find it necessary to rely on *Asbury* to find that the acts that are the basis of Chunmuang's civil liability, in addition to being criminal, also constituted malpractice that would be covered by the policy were it not for the criminal-acts exclusion.

The interpretation of a policy containing an exclusion necessarily has a somewhat different focus. Logically, to give any meaning to the exclusion, it must be interpreted to exclude something that would otherwise be covered. Therefore, we cannot agree with the majority in the Appellate Division and our dissenting colleague that "the 'criminal acts' exclusion was reserved for situations where the criminal conduct has no relation to the professional services sought." *Post* at 105, 698 *A*.2d at 21.

We note that the dissent relies on cases from other jurisdictions involving psychotherapist malpractice for the proposition that a criminal-acts exclusion should not be enforced where the criminal acts are intertwined with malpractice. *Post* at 103–109, 698 *A*.2d at 21–23. That reliance is misplaced. As the Wisconsin Court of Appeals emphasized in *L.L. v. Medical Protective Co.*, 122 *Wis*.2d 455, 362 *N.W*.2d 174, 177 (1984), one of the cases cited by the dissent, a patient's emotional attachment to and dependence on a therapist is a phenomenon of the therapeutic relationship known as "transference." "A sexual relationship between therapist and patient cannot be viewed separately from the therapeutic relationship that has developed between them." *Id.*, 362 N.W.2d at 178. Accordingly, the Wisconsin court declined to apply the criminal-acts exclusion in the policy because it concluded, based on the unique context of the psychotherapist-patient relationship, that the malpractice aspect of the therapist's sexual contact with the patient was inseparable and indistinguishable from any criminal conduct that may have occurred. *Id.* at 178–79. That rationale clearly is inapplicable to nonconsensual sexual contact between other types of physicians and their patients.

We understand that a gynecologist has a greater opportunity than some other physicians to cloak illegitimate sexual assaults in the guise of professional services. However, that fact should have no bearing on the application of a criminal-acts exclusion once it has been demonstrated that the physician's acts were criminal. The damages caused by a physician's criminal conduct, such as a sexual assault, inevitably will be significantly distinct from dam-

ages occasioned by acts of medical malpractice not involving criminal conduct. Moreover, we do not believe that the additional access that a gynecologist has to a patient is fundamentally different from the access that other physicians have whenever a patient places herself or himself in that professional's care. Therefore, to invalidate the exclusion as applied to the patients of gynecologists and not to those of other physicians would be inappropriate. We hold that claims based on injuries caused by a physician's criminal conduct are properly excluded from coverage under the policy at issue. Princeton is not responsible to Davis for the damages she suffered as a result of Chunmuang's sexual assault.

IV

Our holding that public policy is not offended by enforcement of an exclusion in a medical-malpractice policy of liability for injury caused by a criminal act, and that Princeton, accordingly, has no liability for any portion of Davis's judgment that awards compensation for injury caused by Chunmuang's criminal acts, resolves all but one issue posed by this appeal. Although Davis contends that Chunmuang's acts of medical malpractice are inseparable from his criminal conduct, entitling her to coverage from Princeton for the full amount of the judgment, she also alleges that a portion of her damages is attributable to medical malpractice by Chunmuang that is separate and distinct from his criminal conduct. Specifically, she contends that Chunmuang's failure properly to diagnose and treat the condition for which she consulted him was itself a deviation from generally accepted medical standards and that a significant amount of the judgment should be understood to constitute compensation for that deviation.

Our examination of the record at the proof hearing, which was uncontested, reveals that Davis did not attempt to offer evidence of damages attributable solely to acts of malpractice that were independent of Chunmuang's criminal assault. Under the circumstances, which included Chunmuang's default and Princeton's elec-

tion not to defend, no apparent need existed for Davis to attempt to apportion her damages. In view of our disposition of this appeal, Davis should be afforded the opportunity on remand to produce proof of damages caused by Chunmuang's malpractice that is separable from his criminal conduct.

## V

We reverse the judgment of the Appellate Division and remand the matter to the Law Division for further proceedings consistent with this opinion.

O'HERN, J., concurring.

I concur in the opinion and judgment of the Court. I disagree with the view of the dissent that it is "unrealistic to require ... the factfinder to determine the source and uniqueness of the injuries [plaintiff] suffered in this case." *Post* at 110, 698 *A*.2d at 24.

I have little doubt that a judge or jury will be able to assess the damages that this young woman suffered as a result of the doctor's deviations from accepted medical standards. Although the policy does not insure against a criminal act, the policy does insure against an unprofessional act. Plaintiff, therefore, may be compensated to the full extent of the law for the treatment of her condition that fell below standards generally accepted in the medical profession.

HANDLER, J., dissenting.

The issue addressed by the Court in this case is whether a medical malpractice insurer can be held liable for sexual misconduct of its insured under a policy that provides insurance for injury "caused by a medical incident arising out of [the physician's] supplying ... professional services," and specifically excludes coverage for "injury resulting from [the physician's] performance of a criminal act."

The Court concludes that, although the language in the coverage section of the policy is sufficiently broad to provide coverage for the injuries sustained by this patient—injuries from sexual misconduct occurring in the course of a gynecological examination—she nevertheless cannot recover against the insurance carrier because of the policy's exclusion for injuries resulting from criminal acts committed by the physician. The Court adds that the patient may attempt to recover for that portion of her damages that she can prove are derived from the insured's failure to provide proper treatment for the condition for which she initially sought medical care.

On these facts, I believe that the insured's sexual misconduct was so intertwined with his medical malpractice—both the mishandling of the examination and the failure properly to treat plaintiff's condition—that it is not realistically possible to identify, differentiate, and quantify the injuries occasioned by the malpractice apart from the injuries attributable to the sexual misconduct. Yet, the Court's approach demands that analysis, and thereby inevitably assures a result that will be artificial and arbitrary, and one that will drastically reduce, or quite possibly eliminate, recovery.

The Court's interpretation is not required by the language or essential meaning of the insurance policy; its result is patently unfair, if not unconscionable, to this injured patient. I dissent.

I

The facts in this case, largely undisputed at this juncture of the litigation, are extremely important. They are recapitulated by the Court. *Ante* at 82–85, 698 *A*.2d at 10–11. It warrants iteration, however, that when June Davis visited with Dr. Prasert Chunmuang in November 1992, she was extremely young and inexperienced, factors that lend greater significance to her state of dependence, helplessness, and passivity as a patient undergoing a gynecological examination. In addition, Davis's attorney informed the Court that Chunmuang had been indicted based on complaints filed by several of his patients, including Davis, and that he pled

guilty to several of the charges. *Ante* at 82, 698 *A.*2d at 10. Chunmuang's plea bargain did not, however, include a conviction or acknowledgment of criminal guilt for the conduct stemming from Davis's gynecological examination.

## II

### A.

The initial question posed is whether the misconduct of Dr. Chunmuang falls within the coverage of the insurance policy. The coverage provisions of the insurance policy state:

> We will pay all amounts up to the limit of liability which you become legally obligated to pay as a result of injury to which this insurance applies. The injury must be caused by a "medical incident" arising out of your supplying or failure to supply professional services.

The policy defines "medical incident" as

> any act or failure to act ... in the furnishing of the professional medical ... services by you.... Any such act or failure to act, together with all related acts or failures to act in the furnishing of such services to any one person shall be considered one "medical incident."

The Appellate Division relied on *St. Paul Fire & Marine Ins. Co. v. Asbury,* 149 *Ariz.* 565, 720 *P.*2d 540 (App.1986), as support for its conclusion that the insured's conduct constituted medical malpractice covered by the insurance policy. 292 *N.J.Super.* 349, 355, 678 *A.*2d 1143 (1996). In *Asbury,* as in this case, a gynecologist was accused of improperly manipulating his patients during gynecological examinations. *Asbury, supra,* 720 *P.*2d at 541. The policy at issue provided coverage for claims arising from "professional services," and the *Asbury* court held that coverage was applicable to misconduct, such as sexual assault, that is "intertwined with and inseparable from the services provided." *Id.* at 542.

In *Records v. Aetna Life & Cas. Ins.,* 294 *N.J.Super.* 463, 683 *A.*2d 834 (App.Div.1996), the court adopted what has been characterized as the "substantial nexus" test, *ante* at 93, 698 *A.*2d at 16, ruling that "conduct which has a substantial nexus to an insured

activity may be found to 'arise out of' that activity even if it is unlawful." *Id.* at 469, 683 *A*.2d 834. Relying on that decision, the Court determines that "[w]e have no difficulty in concluding that [the insured's actions] constituted a 'medical incident' as defined by Chunmuang's malpractice policy." *Ante* at 98, 698 *A*.2d at 18.

I agree with the Court that the language contained in the coverage clause of this policy is broad enough to encompass sexual misconduct occurring during the course of a medical examination. There can be no question of coverage where, as here, that sexual misconduct is virtually inseparable from and overlaps with the conduct entailed in providing the medical service itself.

### B.

The Court's result in this case is founded on its interpretation of the criminal-acts exclusion. That interpretation calls for a contrived application of the exclusionary clause to these facts. The Court's analysis unfairly requires Davis to prove, and unrealistically asks the fact-finder to determine, those injuries that are attributable to the insured's acts of omission (the failure to perform a proper gynecological examination, as well as the failure to treat the condition for which the patient sought treatment) and the injuries attributable solely to the insured's acts of sexual misconduct. The Court fails to recognize that, essentially, Davis was injured by the insured's failure to administer a proper gynecological examination—he performed the examination for purposes of sexual gratification. The gravamen of the malpractice was conduct that constituted criminal conduct.

The language of the policy's exclusionary clause does not require the Court's extremely literal interpretation. Under "Exclusions," the policy reads:

This insurance does not apply for:

(a) injury resulting from your performance of a criminal act.

That language does not displace the natural and sensible meaning that it is only injury resulting solely, essentially, or primarily from a discrete and separately identifiable criminal act that is excluded from the coverage of the policy. Thus, the Appellate Division found that the "criminal acts" exclusion was reserved for situations where the criminal conduct has no relation to the professional services sought. 292 *N.J.Super.* at 360, 678 *A.*2d 1143.[2]

Support for that construction of the criminal-acts exclusion in the context of the facts of this case is supported by the analogy to alleged medical malpractice by a mental health care professional who mishandles "transference" resulting in sexual contact between himself and his patient. There are strong similarities between the psychotherapist-coverage/exclusion cases and the case presently before the Court. In fact, as noted by the Appellate Division, "the allowance of coverage for injuries suffered by a victim of a gynecologist's excessive examination of sexual organs is on a firmer legal footing than the mental health professional coverage based on the psychiatric theory of transference...." *Ibid.* The Court is unpersuaded by the analogy to the psychiatric-malpractice cases. There are, to be sure, differences in the two situations, yet, in applying the exclusion in this case, the Court dramatically overstates those distinctions. *See ante* at 91, 698 *A.*2d at 14 ("[T]he factual basis in cases involving mental health care professionals differs significantly from cases involving other physicians....").

Care for the patient's psychological and emotional well-being— central to the mission of the psychotherapist—is an important aspect of the task of the gynecologist. *See* ACOG Committee Opinion: Sexual Misconduct in the Practice of Obstetrics and

---

[2] Relying on *Ambassador Ins. Co. v. Montes,* 76 *N.J.* 477, 388 *A.*2d 603 (1978), the court determined that on payment of claims of malpractice under the policy, including those involving sexual misconduct, the insurer's recourse was to seek indemnification from its insured, Chunmuang. 292 *N.J.Super.* at 361, 678 *A.*2d 1143.

Gynecology: Ethical Considerations, 48 *Int'l. J. of Gynecology & Obstetrics,* 239 (1995) ("the practice of obstetrics and gynecology includes interaction at times of intense emotion and vulnerability for the patient and involves both sensitive physical examinations and medically necessary disclosure of a specially private information about symptoms and experiences."). In respect of a patient required to undergo a gynecological examination, her intimate privacy, bodily integrity, and personal dignity are involved and are at risk. Privacy, individual integrity, and personal dignity similarly are implicated in psychiatric treatment. In both situations, the patient is vulnerable, dependent, and essentially helpless, and it is the doctor's clear professional responsibility and ethical duty to avoid taking advantage of that condition for purposes of sexual gratification.[3] In neither case can the conduct be justified by implied consent. *See* ACOG Committee Opinion, *supra,* at 239–40 (rejecting contention that patient's consent to sexual contact is "meaningful" because of "the disparity in power, status, vulnerability and need."); *see also ante* at 91, 698 *A.*2d at 14 (recognizing

---

[3] Regulations of the Board of Medical Examiners specifically identify certain kinds of sexual behaviors that the Board "deem[s] to be violative of law."

*N.J.A.C.* 13:35–63 provides:

(c) A licensee shall not engage in sexual contact with a patient with whom he or she has a patient-physician relationship

. . . .

(e) A licensee shall not engage in any discussion of an intimate nature with a patient, unless that discussion is related to legitimate patient needs. . . .

(f) A licensee shall provide privacy and examination conditions which prevent the exposure of the unclothed body of the patient unless necessary to the professional services rendered.

. . . .

(i) A licensee shall not engage in any other activity (such as, but not limited to, voyeurism or exposure of the genitalia of the licensee) which would lead a reasonable person to believe that the activity serves the licensee's personal prurient interest or is for the sexual arousal, the sexual gratification or the sexual abuse of the licensee or patient.

(j) Violation of any of the prohibitions or directives set forth at (c) through (i) above shall be deemed to constitute gross or repeated malpractice pursuant to *N.J.S.A.* 45:1–21(c) or (d) or professional misconduct pursuant to *N.J.S.A.* 45:1–21(e).

that "in cases involving mental health care professionals ... consent [to sexual conduct] may be considered coerced."). Perhaps most significantly, the intentions and actions of the psychotherapist who "mishandles" transference for purposes of sexual gratification are precisely analogous to those of the gynecologist in the present case. It is unclear, therefore, why the victim of the psychotherapist's malpractice should recover under a professional malpractice policy and the victim of the gynecologist's malpractice should not.

Criminal-acts exclusions do not apply to claims based on the mishandling of transference resulting in sexual contact between the therapist and the patient. In *L.L. v. Medical Protective Co.*, 122 *Wis.*2d 455, 362 *N.W.*2d 174 (App.1984), *review denied*, 122 *Wis.*2d 783, 367 *N.W.*2d 223 (1985), the court did not dispute the insurance company's contention that the therapist's actions were criminal. The court held, however, that:

> L.L. does not merely allege ... that she was damaged by Siegel's performance of criminal acts. She alleges that she was damaged by Siegel's failure to exercise the degree of skill and care ordinarily exercised by other psychiatrists and by Siegel's failure to provide appropriate forms of treatment. These are allegations of malpractice, not of criminality.
>
> The insurance policy does not clearly indicate whether it is meant to cover acts by the insured psychiatrist which constitute or are evidence of malpractice but which also are defined as criminal. Where the meaning of an insurance policy is unclear, it must be construed against the insurer and in favor of coverage.
>
> [*Id.*, 362 *N.W.*2d at 178–79 (footnote omitted).]

Similarly, in *Vigilant Ins. Co. v. Kambly*, 114 *Mich.App.* 683, 319 *N.W.*2d 382, 385 (1982), the court held that a policy provision that "there is no coverage ... for legal expense incurred due to alleged criminal act" did not operate to exclude coverage for legal expenses arising from the defense of a malpractice action based on sexual contact between a psychiatrist and his patient. The court reasoned that "the expenses incurred by Dr. Kambly were not incurred 'due to alleged criminal act' but due to alleged malpractice in a civil action." *Ibid; cf. Simmons v. United States*, 805 *F.*2d 1363 (9th Cir.1986) (relying on psychotherapist-coverage cases for conclusion that federal government may be held vicari-

ously liable for mishandled transference by Indian health-care service counselor).

The crucial point eluding the Court is that "the gravamen of the [claim] is that [the insured] did not treat [Davis] properly and as a result she was injured." *St. Paul Fire & Marine Ins. Co. v. Mitchell*, 164 *Ga.App.* 215, 296 *S.E.*2d 126, 128 (1982) (citing *Zipkin v. Freeman*, 436 *S.W.*2d 753, 761 (Mo.1968)). Although the sexual misconduct may be criminal, the injuries flowing from that behavior are part and parcel of the injuries flowing from the malpractice such that the patient's claim is essentially a claim of malpractice. *Cf. Sommer v. New Amsterdam Cas. Co.*, 171 *F.Supp.* 84, 86 (E.D.Mo.1959) (stating, in insurance-coverage case involving both malpractice and alleged criminal conduct by the insured, that "[t]he word 'malpractice' includes the performance of criminal acts"); *Kambly, supra*, 319 *N.W.*2d at 384 (providing that alleged criminal conduct on part of psychiatrist could constitute part of malpractice in transference-coverage case). The patient should not be penalized by the Court because the care provided by Dr. Chunmuang was so poor that it not only constituted grave malpractice, but also traversed into the realm of criminal and ethical offenses.

A finding of coverage despite the exclusionary clause would comport with the reasonable expectations of the insured. *See Martusus v. Tartamosa*, 150 *N.J.* 148, 159, 696 *A.*2d 1, 6 (1997) ("The insured's reasonable expectations should govern 'to the extent the policy's language allows.'") (citing *The Salem Group v. Oliver*, 128 *N.J.* 1, 4, 607 *A.*2d 138 (1992)). As with the psychotherapist who expects coverage when impermissible sexual contact results from transference, the gynecologist is engaged in a practice that is fraught with possible sexual implications and involves a high risk of actual or alleged sexual misconduct. Such a practitioner reasonably would expect to be covered under his professional-liability policy when claims arise that are based on conduct that is wholly part of a gynecological examination. Furthermore, it is extremely unlikely that the insured was induced to engage in this

behavior in reliance on the expectation of insurance coverage for any claims that might have resulted from his conduct. *See Kambly, supra,* 319 *N.W.*2d at 385.

The criminal-acts exclusion should be interpreted narrowly as a matter of sound public policy. *See Records, supra,* 294 *N.J.Super.* at 468, 683 *A.*2d 834; *see also Illinois State Medical Ins. Serv. v. Cichon,* 258 *Ill.App.*3d 803, 196 *Ill.Dec.* 277, 281, 629 *N.E.*2d 822, 826 (1994) (rejecting the definition of sexual conduct in Illinois Criminal Code for purposes of defining the term as used in the policy exclusion). Indeed, the Court recognizes that well-settled principle of policy interpretation. *See ante* at 95, 698 *A.*2d at 16 ("In general, insurance policy exclusions must be narrowly construed. . . ."). Application of that principle is especially appropriate where, as here, the beneficiary of the coverage determination is not really the insured but rather is a third-party victim of the insured. *Cf. Mitchell, supra,* 296 *S.E.*2d at 128 ("No longer is it the law in this state 'that the liability policy existed solely for the protection of the insured.' The courts recognize that the injured person also is to be protected.") (quoting *Hartogs v. Employers Mut. Ins. Co.,* 89 *Misc.*2d 468, 391 *N.Y.S.*2d 962, 964 (Sup.Ct. 1977)). The interpretation and application of the exclusionary clause must be influenced, if not mandated, by the strong public policy reflected in statutory and regulatory enactments (*N.J.S.A.* 45:1–21(c) and (e); *N.J.A.C.* 13:35–63(j)), that equate the kind of sexual misconduct that occurred in this case with "gross[ ] malpractice" and "professional misconduct."

I am also persuaded that the Court's application of the criminal-acts exclusion will discourage the proper reporting of sexual misconduct. A rule of exclusion that provides for less recovery whenever criminal sexual conduct is alleged will serve as a disincentive to the reporting of such conduct. *See McConaghy v. RLI Ins. Co.,* 882 *F.Supp.* 540, 542–43 (E.D.Va.1995) (stating that the court was "deeply troubled by the apparent inequitable disparity in coverage—a person who has suffered more is able to recover less"); *American Home Assurance Co. v. Cohen,* 124 *Wash.*2d

865, 881 *P.*2d 1001, 1009 (1994) (observing that denial of coverage for sexual misconduct that is attributable to medical malpractice violated public policy because it would discourage patients from reporting sexual misconduct).

Despite those strong policy justifications in favor of a finding of recovery, and despite the persuasive analogy to the psychothera- pist-coverage cases, the Court forces an innocent victim—one who was especially inexperienced, dependent, and psychologically and emotionally fragile—to unravel her serious injuries; she is required to segregate that portion of her injuries attributable to her doctor's failure to diagnose and treat her underlying condition from that portion attributable to the doctor's sexual misconduct, which took place during and as part of the same examination. We have recognized that there are substantial and distinctive injuries associated with sexual assault. *E.g. Collins v. Union Co. Jail,* 150 *N.J.* 407, 696 *A.*2d 625 (1997) (recognizing claim for post-traumatic-stress disorder resulting from sexual assault of prisoner by prison guard). However, the Court's contention that "[t]he damages caused by a physician's criminal conduct, such as sexual assault, inevitably will be significantly distinct from damages occasioned by acts of medical malpractice not involving criminal conduct," *ante* at 99–100, 698 *A.*2d at 19, is simply untenable on these facts. The damages occasioned by defendant's malpractice are not "significantly distinct" from those occasioned by his sexual misconduct. I dissent not because I find the behavior of the gynecologist to be any less criminal because of the gynecologist's "additional access," *ante* at 100, 698 *A.*2d at 19, but rather because I find it too unrealistic to require the plaintiff to prove and the factfinder to determine the source and uniqueness of the injuries she suffered in this case.

### III

The policy language here is amenable to a construction that would provide coverage for injuries attributable to sexual misconduct that arise from and are intertwined with medical malpractice.

There is a strong, if not compelling, analogy to the psychoanalyst-coverage cases in which courts have found coverage even under policies that contain criminal-acts exclusions. Moreover, the insured reasonably would expect that medical malpractice that verges into sexual misconduct—particularly possible in the case of mental health care professionals and gynecologists—would be covered. Finally, exclusions for criminal acts should, on grounds of public policy and unconscionability, be applied narrowly and not remove from coverage sexual misconduct that is otherwise virtually inseparable from underlying medical malpractice.

I dissent.

Justice COLEMAN joins in this opinion.

O'HERN, J., concurs in result.

*For reversal and remandment*—Chief Justice PORITZ, and Justices POLLOCK, O'HERN, GARIBALDI and STEIN—5.

*For affirmance*—Justices HANDLER and COLEMAN—2.